[No. B205279. Second Dist., Div. Eight. Apr. 8, 2010.]

ELISHEBA SABI, Plaintiff and Appellant, v.
DONALD T. STERLING et al., Defendants and Respondents.

920

**COUNSEL**

McDermott Will & Emery, Brandon J. Roker, Gregory R. Jones; Denise McGranahan; Brancart & Brancart, Christopher Brancart; and Catherine M. Bishop for Plaintiff and Appellant.

Farella Braun & Martel, Grace K. Won, Andrew W. Ingersoll, Monica Swanson Hunt; and Linda D. Kilb for Disability Rights Advocates, Disability Rights California, Disability Rights Education and Defense Fund, Disability Rights Legal Center, Law Foundation of Silicon Valley and Legal Aid Society—Employment Law Center as Amici Curiae on behalf of Plaintiff and Appellant.

Barbara Jones for AARP, Legal Services of Northern California and National Senior Citizens Law Center as Amici Curiae on behalf of Plaintiff and Appellant.

Howrey, Constance F. Ramos and Michael C. Chou for Bet Tzedek Legal Services, Housing Rights Center, Inner City Law Center, Coalition for Economic Survival, Tenants Together, Tenderloin Housing Clinic, the Impact Fund and Public Counsel as Amici Curiae on behalf of Plaintiff and Appellant.

Klinedinst, G. Dale Britton, Gregory A. Garbacz; and Douglas L. Walton for Defendants and Respondents.

Pahl & McCay, Stephen D. Pahl, Karen K. McCay and Servando R. Sandoval for California Apartment Association as Amicus Curiae on behalf of Defendants and Respondents.

Law Offices of Cummings Myer, Thomas B. Cummings and Audrey L. Myer for Apartment Association of Orange County as Amicus Curiae on behalf of Defendants and Respondents.

Trevor A. Grimm and Craig Mordoh for California Apartment Law Information Foundation as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

FLIER, J.—Appellant Elisheba Sabi brought an action alleging six causes of action against respondents Donald T. Sterling Corporation and Donald T. Sterling individually. The causes of action alleged that respondents violated the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) by discriminating against appellant because of her disability (first); California's Unruh Civil Rights Act (Civ. Code, § 51 et seq.) (second); FEHA by discriminating against appellant because of source of income (third); and the Unruh Civil Rights Act by discriminating against appellant on the basis of her status as a recipient of "Section 8"[1] housing assistance (fourth). The fifth cause of action for unfair competition and the sixth cause of action for negligence were voluntarily dismissed by appellant.[2]

The trial court dismissed the second, third and fourth causes of action for reasons discussed below. The jury returned a verdict for respondents on the remaining cause of action, finding that respondents had not violated FEHA. We affirm.

### FACTS

This case revolves around a provision of the United States Housing Act of 1937 (42 U.S.C. § 1437 et seq.) that was section 8 of that act and now appears as title 42 United States Code section 1437f. This statute sets forth a relatively complex program that authorizes assistance payments "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing . . . ." (42 U.S.C. § 1437f(a).) We will adopt the usage followed by the parties and the trial court, as well as other appellate courts, and refer to this as "Section 8" assistance payments.

The nub of the controversy is that appellant became eligible to receive Section 8 assistance payments but that respondents refused to participate in the Section 8 program and thus refused to accept rent subsidy payments that would have been paid under the Section 8 program for the apartment rented by appellant.

The foundational facts are not disputed. Appellant is an elderly widow who immigrated to the United States from Iran in 1985 when she was 52 years old. She suffers from several physical and psychological disabilities and receives as a consequence Supplemental Security Income (SSI) from the

---

[1] The origin and meaning of Section 8 housing assistance is explained below.

[2] Respondents' motion for summary adjudication on the claim for punitive damages was granted prior to trial.

Social Security Administration. She has lived since 1987 in an apartment owned by respondents and continues to live there to this day. Listed on the lease for the apartment along with appellant are her two sons who no longer live there. The apartment, located in Santa Monica, is rent-controlled. After appellant's husband died of cancer in January 2004, appellant's SSI was no longer adequate to cover the rent, which was $1,233 per month in 2007. It appears that all or some portion of the rent is paid by appellant's sons.

Appellant and her husband applied to the Housing Authority of the City of Santa Monica (SMHA) for Section 8 assistance in 1998. Given the demand for Section 8 assistance, it was not until 2003 that SMHA notified appellant and her husband that they had become eligible for Section 8 assistance. As we set forth more fully below, under the Section 8 program, the tenant pays 30 percent of income for rent, the balance of the rent being paid by the housing authority administering the Section 8 program. Appellant and her husband were issued a Section 8 voucher by SMHA in July 2003. The issuance of a voucher is a distinct step in the Section 8 process; we set forth the salient aspects of that process, together with a definition of a voucher, below.

Beginning in August 2003, when appellant's daughter first approached the building manager with the request that the manager accept Section 8 assistance payments, and lasting until the time that this suit was filed in April 2004, respondents rejected appellant's request and refused to participate in the Section 8 program. Appellant's family soon enlisted the assistance of the Legal Aid Foundation of Los Angeles (LAFLA), which repeatedly wrote respondents, requesting that respondents accept the Section 8 assistance payments as a reasonable accommodation to appellant. But nothing that appellant's family or LAFLA said would change respondents' mind about refusing to participate in the Section 8 program. We do not find it necessary to chronicle the details of the dealings between the parties during this period, save to note that they were protracted and fruitless.

The repartee between appellant's family, LAFLA and respondents between August 2003 and April 2004 was punctuated by the family's efforts to find other living quarters for appellant. In the end, these efforts were abandoned because appellant and her family concluded for a number of reasons that she was best off in her current apartment. We are told that appellant continues to pay the rent and that she has not been asked to vacate the apartment.

## PROCEDURAL HISTORY

■ Government Code section 12955 (hereafter section 12955), which is part of FEHA, prohibits discrimination based on the source of income.[3] Prior to trial, the court rebuffed two attempts, by demurrer and motion for summary judgment, by respondents to have the court conclude that Section 8 assistance payments do not constitute a source of income under FEHA. The third attempt came in a "trial brief" that was submitted two months before the trial actually commenced. In this brief, respondents once again contended that Section 8 assistance payments do not qualify as a source of income under section 12955. After noting that the parties were in agreement that this contention presented solely a legal issue that the court would have to decide, the trial court concluded that Section 8 assistance payments were not a source of income for the tenant on whose behalf such payments are made. This hearing took place on August 9, 2007; the trial did not commence until October 11, 2007. The court did not sign the memorandum dismissing the third and fourth causes of action with prejudice until after the trial concluded.

On October 11, 2007, after appellant's opening statement, respondents moved for a nonsuit on the second cause of action. This cause of action was based on Civil Code section 54.1, which is a provision contained in the Unruh Civil Rights Act.[4] Respondents contended that there was no evidence that appellant had been denied access to her apartment. Appellant opposed the motion on the grounds that Civil Code section 54.1 requires only that appellant was denied an equal opportunity to use and enjoy the premises. This argument was based on subdivision (b)(3)(B) of section 54.1.[5] After receiving briefing and argument, the trial court granted the motion for nonsuit on the second cause of action on October 27, 2007.

The special verdict that was submitted to the jury posed the question whether appellant proved by a preponderance of the evidence that respondents violated FEHA. This was based on the first cause of action that alleged

---

[3] Section 12955, subdivision (a) provides that it is unlawful "[f]or the owner of any housing accommodation to discriminate against or harass any person because of the race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, *source of income*, or disability of that person." (Italics added.)

[4] The basic provision of the Unruh Civil Rights Act is subdivision (a) of Civil Code section 54: "Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places."

[5] "Any person renting, leasing, or otherwise providing real property for compensation shall not refuse to make reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises." (Civ. Code, § 54.1, subd. (b)(3)(B).)

that respondents discriminated against appellant because of her disability. The jury answered this question with a no. Judgment was entered and costs of $82,082.37 were awarded to respondents. As noted, the trial court entered its written order, with reasons stated, dismissing the third and fourth causes of action (the source of income claims) after the judgment was entered.

## THE STATUTES AND REGULATIONS

### 1. *The Statutes*

The provision that prohibits discrimination because of source of income, subdivision (a) of section 12955, is set forth above. (Fn. 3, *ante.*)

Subdivision (p) of section 12955 provides: "(1) For the purposes of this section, 'source of income' means lawful, verifiable income paid directly to a tenant or paid to a representative of a tenant. For the purposes of this section, a landlord is not considered a representative of a tenant. [¶] (2) For the purposes of this section, it shall not constitute discrimination based on source of income to make a written or oral inquiry concerning the level or source of income."

### 2. *The Regulations*

It is not our intent to render an exhaustive description of the mechanics of the Section 8 program. We focus instead only on the salient aspects of how rent subsidies are paid out under the Section 8 program. We rely here on part 982 of 24 Code of Federal Regulations (2010), which is entitled "SECTION 8 TENANT BASED ASSISTANCE: HOUSING CHOICE VOUCHER PROGRAM."

"In the HUD [(Housing and Urban Development)] Housing Choice Voucher Program (Voucher Program) and the HUD certificate program, HUD pays rental subsidies so eligible families can afford decent, safe and sanitary housing. Both programs are generally administered by State or local governmental entities called public housing agencies (PHAs). HUD provides housing assistance funds to the PHA. HUD also provides funds for PHA administration of the programs." (24 C.F.R. § 982.1(a)(1) (2010).)

There is a distinction between "project-based" and a "tenant-based" assistance. This case involves the latter type of assistance. "To receive tenant-based assistance, the family selects a suitable unit. After approving the tenancy, the PHA enters into a contract to make rental subsidy payments to the owner to subsidize occupancy by the family. The PHA contract with the owner only covers a single unit and a specific assisted family. If the family

moves out of the leased unit, the contract with the owner terminates. The family may move to another unit with continued assistance so long as the family is complying with program requirements." (24 C.F.R. § 982.1(b)(2) (2010).) Under the voucher program, which is the one used in this case, "the subsidy is based on a local 'payment standard' that reflects the cost to lease a unit in the local housing market. If the rent is less than the payment standard, the family generally pays 30 percent of adjusted monthly income for rent. If the rent is more than the payment standard, the family pays a larger share of the rent." (24 C.F.R. § 982.1(a)(4)(ii) (2010).)

The PHA (public housing agency) selects a family for the voucher program based on criteria and conditions that are not material in this case. "When a family is selected, or when a participant family wants to move to another unit, the PHA issues a voucher to the family. The family may search for a unit." (24 C.F.R. § 982.302(a) (2010).) A voucher is defined as a "document issued by a PHA to a family selected for admission to the voucher program. This document describes the program and the procedures for PHA approval of a unit selected by the family. The voucher also states obligations of the family under the program." (24 C.F.R. § 982.4(b) (2010).) "(b) If the family finds a unit, and the owner is willing to lease the unit under the program, the family may request PHA approval of the tenancy. . . . [¶] (c) The family must submit to the PHA a request for approval of the tenancy and a copy of the lease, including the HUD-prescribed tenancy addendum. The request must be submitted during the term of the voucher." (24 C.F.R. § 982.302(b) & (c) (2010).) A voucher has an initial term of 60 days and it may be extended. (24 C.F.R. § 982.303(a) & (b) (2010).)

We now come to the actual payment of housing assistance under the contract between the PHA and the owner, referred to as the HAP (housing assistance payment) contract. "(a) *Payments under HAP contract.* Housing assistance payments are paid to the owner in accordance with the terms of the HAP contract. Housing assistance payments may only be paid to the owner during the lease term, and while the family is residing in the unit. [¶] (b) *Termination of payment: When owner terminates the lease.* Housing assistance payments terminate when the lease is terminated by the owner in accordance with the lease." (24 C.F.R. § 982.311(a) & (b) (2010).) Other methods of termination are termination of the HAP contract and termination of PHA assistance to the family. (24 C.F.R. § 982.311(c) (2010).)

3.  *Appellant's Misinterpretation of the Regulations*

Appellant contends that Section 8 vouchers are paid to a representative of the tenant, which is the PHA. Appellant claims that for the "purposes of FEHA, the PHA serves as the 'representative of the tenant' with respect to Section 8 vouchers."

There are three factual errors in this statement.

First. The PHA, which is in this case the SMHA, receives housing assistance funds from HUD. (24 C.F.R. § 982.1(a)(1) (2010).) The SMHA does not receive vouchers from anyone; the SMHA, as a PHA, *issues a voucher to the tenant*, in this case to appellant.

Second. A voucher is not income and it is not "paid" to anyone. A voucher is a "document issued by a PHA to a family selected for admission to the voucher program. This document describes the program and the procedures for PHA approval of a unit selected by the family. The voucher also states obligations of the family under the program." (24 C.F.R. § 982.4(b) (2010).)

Third. If respondents had been willing to participate in the Section 8 program, the SMHA, as a PHA, would have paid money to respondents under the HAP contract. The SMHA would not have paid in vouchers but in money.

In her reply brief, appellant appears to have retreated from the idea that vouchers are paid to the PHA. Instead, appellant states that HUD pays the "housing subsidy funds (the 'lawful, verifiable income') to the PHA (the 'tenant representative')." This not how the program operates. "HUD provides housing assistance funds to the PHA." (24 C.F.R. § 982.1(a)(1) (2010).) In other words, the housing assistance funds are federal funds transferred by HUD to the PHA. If a number of events had occurred, some small portion of those housing assistance funds would have been paid to respondents as a subsidy for appellant's rent. But the federal housing assistance funds *received by the SMHA as a PHA* is not appellant's income. It is not anyone's income; it is a transfer of federal funds to the SMHA.

We do not mean to say that funds paid by a PHA to the owner of a rental unit is not income. Such funds are clearly someone's income. This case revolves around the question whether these payments are the *tenant's* income.

## THE ENACTMENT OF STATUTES 1999, CHAPTERS 589–592

Pursuant to Statutes 1999, chapter 592, section 17(g) at pages 4278–4279, section 12955 incorporated amendments contained in Statutes 1999, chapters 589–592, page 4165 et seq. This legislation was signed into law by the Governor effective January 1, 2000. These amendments were part of the California Civil Rights Amendments of 1999. (Stats. 1999, ch. 591, § 1, p. 4195.) We will refer to these amendments as the 1999 amendments.

The 1999 amendments contained numerous other provisions besides subdivisions (a) and (p) of section 12955. We set forth in the margin the statutes that were affected by the 1999 amendments.[6] It is evident that the 1999 amendments had a much broader range than merely the new provisions about source of income discrimination.

As enacted in 1999, section 12955, subdivision (p)(1) did *not* contain this sentence: "For the purposes of this section, a landlord is not considered a representative of a tenant." This sentence was added by an amendment enacted in 2004, in Statutes 2004, chapter 568, section 8. We will from time to time refer to this enactment as the 2004 amendment.

As might be expected, legislation as broad in scope and purpose as the 1999 amendments generated voluminous legislative analyses and committee reports. The (unfortunately) unpaginated and prolix tumble of documents comprising the legislative history of the 1999 and 2004 amendments is nearly two inches thick.

Appellant focuses on two legislative committee reports in an effort to demonstrate that the legislative history shows that it was the intent of the Legislature to enact legislation that compelled landlords to accept Section 8 assistance payments from a PHA. As we discuss below, we do not think that the legislation requires interpretation because, in the final analysis, section 12955, subdivision (p), as it stands now, is not ambiguous. Nonetheless, a full account of appellant's claims in this case cannot be rendered without a consideration of these committee reports. We therefore set forth in detail the legislative committee reports that appellant relies on.

Appellant quotes from the Senate Judiciary Committee's third reading analysis of Senate Bill No. 1098 (1999–2000 Reg. Sess.) as amended April 7, 1999. It appears, however, that appellant ignores the setting in which the cited comment was made and that appellant omits significant portions of the comment. The cited comment, which we reproduce below, commented on section 12955, proposed subdivision (n), now subdivision (*o*), which we set forth in the margin.[7] We underline the text in this comment that appellant quotes in her opening brief; the portions not underscored are not quoted by appellant. "Proposed subdivision (n) of Section 12955 of the Government

---

[6] Amendments were made to Civil Code section 51.5; Government Code sections 11139, 12921, 12926, 12927, 12930, 12940, 12945, 12948, 12955, 12965, 12970, 12989.2, and 12989.3; and a provision was added to Government Code section 12955. (See Stats. 1999, ch. 591, p. 4195.)

[7] Subdivision (*o*) of section 12955 prohibits "[i]n instances where there is a government rent subsidy, [the landlord] to use a financial or income standard in assessing eligibility for the rental of housing that is not based on the portion of the rent to be paid by the tenant."

Code would prohibit the use of a financial or income standard based on a multiple or percentage of the rent that, in cases where there is a government rent subsidy, fails to calculate the minimum income based only on the portion of the rent to be paid by the tenant. This provision also arises out of the growing trend among landlords to flatly refuse to rent to anyone on Section 8 housing or, more blatantly, to evict an existing Section 8 tenant because the landlord no longer wants to accept Section 8 vouchers. The problem is widespread, with 15,200 Section 8 vouchers in San Francisco alone, and many more thousands statewide. [¶] Proponents contend that this form of discrimination is creating tremendous hardships for the disabled and the elderly, who now find that they are being lawfully discriminated against because they are recipients of Section 8 assistance. The discrimination is also making it harder for people trying to transition from welfare to work, and for working families with low or modest incomes. [¶] The proposed language is a pared down version of a broader proposal which sought to prohibit arbitrary discrimination based on sources of income. Proponents point out that at least 12 other states prohibit 'source of income' or Section 8 discrimination. [¶] The landlord groups have expressed the strongest opposition to other, stronger version[s] of this provision. (That provision, once contained in [Senate Bill No.] 1730,[8] last year's measure, would have prohibited the use of arbitrary financial or income standards, and would have overturned *Harris* [v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873]].)[9] The landlord groups say that the problem of finding housing for low and moderate income tenants should not be transferred to private property owners, and argue that property owners should be able to decide if they no longer want to forebear the administrative burdens associated with accepting Section 8 housing vouchers. They also maintain that they should continue to be able to use appropriate financial and income standards in making rental decisions. Both sides are in continuing discussions over the proposed provisions." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Apr. 7, 1999, pp. 5–6.)

Appellant contends that the thrust of the foregoing comment is to equate source of income discrimination with discrimination based on the fact that the tenant is eligible for Section 8 assistance payments. That is, the argument is that the phrase "source of income" in subdivision (a) of section 12955 (see fn. 3, *ante*) really means discrimination based on Section 8 eligibility.

---

[8] As we point out below, appellant also cites from the legislative history of Senate Bill No. 1730 (1997–1998 Reg. Sess.), which did not become law.

[9] The court in *Harris v. Capital Growth Investors XIV* rejected the argument that a landlord's policy of a minimum income requirement violated the Unruh Civil Rights Act.

Appellant contends that in analyzing Senate Bill No. 1098 (1999–2000 Reg. Sess.) as amended on July 8, 1999,[10] "the Assembly Committee on Appropriations also recognized the importance of Section 8 to [Senate Bill No.] 1098 generally as 'a modest effort to address some of the issues affecting low-income renters.' "

The phrase that appellant quotes is from the analysis of the Assembly Committee on Appropriations, dated August 18, 1999, of certain aspects of Senate Bill No. 1098 (1999–2000 Reg. Sess.) as amended July 8, 1999. As will become apparent when we set forth the entire comment in which the quoted observation was made, the aspect of Senate Bill No. 1098 that was at issue was the provision that a rental unit is not decontrolled for rent control purposes if the tenancy is terminated because the landlord refuses to accept Section 8 assistance payments and the tenant cannot pay the rent without a Section 8 subsidy. The comment containing the phrase quoted by appellant follows. We again underline the passage that appellant quotes; appellant makes no mention of the balance of the comment. "The author indicates that SB 1098 is <u>a modest effort to address some of the issues affecting low-income renters</u>, particularly at a time when the healthy economy is pushing rent levels to new highs, thus putting more housing out of reach for tenants on fixed incomes. Proponents, including the Western Center on Law and Poverty (sponsor), argue that allowing a landlord to impose a decontrolled rent solely because he terminates his Section 8 contracts and causes the tenant's eviction does not comport with the requirement of a voluntary vacancy by the former tenant.[11] It is no different, proponents argue, than when a termination is achieved by the landlord unilaterally issuing a 30-day termination notice or by changing the terms of the tenancy in a manner which makes it impossible for the tenant to stay. The Legislature recognized the potential for mischief in those cases and specifically provided that those types of terminations are not voluntary vacancies." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended July 8, 1999, p. 2.)

It is evident that the foregoing committee analysis simply does not "recognize[] the importance of Section 8 to [Senate Bill No.] 1098," as appellant contends. On the contrary, it clearly assumes that the landlord has a right to terminate the landlord's participation in the Section 8 program.

---

[10] Senate Bill No. 1098 (1999–2000 Reg. Sess.) was enacted by Statutes 1999, chapter 590, section 4, pages 4180–4182.

[11] The reference is to the ability of the landlord to raise rents if the prior tenancy was voluntarily vacated.

## THE ENACTMENT OF STATUTES 2004, CHAPTER 568

Senate Bill No. 1145 (2003–2004 Reg. Sess.), introduced on January 22, 2004, was another wide-ranging enactment covering a number of subjects; it was enacted by Statutes 2004, chapter 568, section 8. In order to show the range of chapter 568, we again set forth the Legislative Counsel's Digest of its provisions.[12]

The original version of Senate Bill No. 1145 (2003–2004 Reg. Sess.) proposed no changes in subdivision (p) of section 12955. Senate Bill No. 1145 was amended in April, May and June 2004 in both houses. In June 2004, Senate Bill No. 1145 proposed to amend subdivision (p) of section 12955 by adding the sentence: "For the purposes of this section, a landlord is not considered a representative of a tenant."

---

[12] "LEGISLATIVE COUNSEL'S DIGEST

"[Senate Bill No.] 1145, Burton. Tenancy.

"(1) Until January 1, 2006, existing law requires that if a landlord increases the rent of a month-to-month tenancy in excess of 10% of the amount of the rent charged to a tenant annually, as specified, the landlord shall provide an additional 30 days' notice, for a total of 60 days, prior to the effective date of the increase, except as specified.

"This bill would delete the sunset date on the above provision, thereby extending that provision indefinitely.

"(2) Existing law requires that a landlord provide specified statements to a tenant if an initial inspection prior to the termination of a tenancy is requested by the tenant.

"This bill would modify that list of statements to delete a required statement regarding a claim of security.

"(3) Existing law authorizes an owner of residential real property to establish the initial and subsequent rental rates for a dwelling or unit, upon specified circumstances.

"This bill would make nonsubstantive, technical changes to those provisions.

"(4) In a summary proceeding for the possession of real property, existing law prohibits a court clerk from providing access to the court file, index, register of actions, and other court records if the defendant prevails in the action within 60 days after the complaint is filed.

"This bill would permit a court clerk to provide access to those records to specified persons, including, but not limited to, a party to the action, or pursuant to a court order upon a showing of good cause.

"(5) Any public entity that has in effect any system of rent control is authorized to subject to specified provisions, accommodations that had been withdrawn from rent or lease and are again offered for rent or lease, as specified.

"This bill would make a nonsubstantive, technical change to a related provision.

"(6) The Fair Employment and Housing Act prohibits housing discrimination on the basis of race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability. Until January 1, 2005, the act also prohibits discrimination on the basis of a person's source of income, the failure to account for the aggregate income of coresidents, or the failure to exclude a government rent subsidy from that portion of the rent to be paid by the tenant in assessing his or her eligibility for rental housing.

"This bill would delete the sunset date on the above provision, thereby extending that provision indefinitely." (Legis. Counsel's Dig., Sen. Bill No. 1145 (2003–2004 Reg. Sess.).)

Appellant cites to the analysis of the Senate Judiciary Committee of Senate Bill No. 1145 (2003–2004 Reg. Sess.), dated April 20, 2004. Comment 3 of that analysis speaks to the 2004 amendment of section 12955, subdivision (p). Keeping in mind that much of Senate Bill No. 1145 was designed to repeal sunset provisions found in the 1999 amendments, comment 3 is entitled "Stated need to extend law prohibiting tenant selection based on source of income." (Underscoring omitted.) We set forth the entire discussion under part 3 of the Discussion:

"WCLP [(Western Center on Law and Poverty)] asserts that prior to [Senate Bill No.] 1098 (Burton) of 1999, some landlords would inform prospective tenants, 'No Social Security, no welfare [allowed].'

"WCLP writes in support of the extension of [Senate Bill No.] 1098 (and repeal of its pending January 1, 2005 sunset):

" 'Under [Senate Bill No.] 1098, landlords are not forced to rent to any tenant—the landlord's selection process would remain the same. But under [Senate Bill No.] 1098, a landlord may not arbitrarily reject a prospective tenant simply because of the person's "lawful, verifiable" source of income. Also, any income test that the landlord has (such as a formula that the prospective tenants' income must be at least 3 times the monthly rent) must aggregate all the prospective roommates' incomes, rather than requiring each roommate to meet the test individually. This is an important provision so that low or modest income roommates can qualify for rentals.'

"The landlords' lobby is not opposed to the extension but writes that the law should be clarified to provide that for purposes of the section, 'the landlord is not a representative of the tenant.' CAA [(California Apartment Association)] asserts that some consumer organizations have incorrectly argued that the property owner is the representative of the tenant when a tenant's lawful, verifiable income is paid to the landlord, such as [*sic*] the case in Section 8 housing.

"WCLP responds that all of the parties agreed to the language in the original bill, [Senate Bill No.] 1098, which was drafted purposefully to avoid deciding one way or the other the long running issue of whether a landlord must accept Section 8 payments. WCLP also responds that the language has not been a problem in any California cases, and that the concern may be arising out of a New Jersey case.[13] Nonetheless, WCLP notes that in cases such as Section 8 housing, the landlord is in fact the designated payee, or

---

[13] *Franklin Tower One v. N.M.* (1999) 157 N.J. 602 [725 A.2d 1104, 1112–1113] (Section 8 assistance payments are income under New Jersey's source of income discrimination statute).

payee representative, of the tenant, and that, if necessary, the language of the statute could be modified accordingly." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1145 (2003–2004 Reg. Sess.) as amended Apr. 19, 2004, pp. 5–6.)

We now turn to the contentions on appeal.

## DISCUSSION

1. *Section 8 Assistance Payments Are Not Paid to the PHA but to the Landlord*

Appellant contends that "Section 8 Vouchers are 'Paid to a Representative of the Tenant'—the Public Housing Authority." (Boldface omitted.)

■ We have already clarified that the PHA is not paid any vouchers; the PHA *issues* vouchers, which serve the purpose of notifying the tenant that he or she is eligible for Section 8 assistance payments. We have also explained that the PHA then enters into a HAP contract with the landlord. As the pertinent regulation states, "[h]ousing assistance payments are paid to the owner in accordance with the terms of the HAP contract. Housing assistance payments may only be paid to the owner during the lease term, and while the family is residing in the unit." (24 C.F.R. § 982.311 (2010).) In other words, the PHA pays money directly to the landlord. The only thing that the PHA receives are funds from HUD and that, as we have explained, is a transfer or grant of federal funds to the PHA; these funds are not anyone's income.

The reason that appellant contends that Section 8 vouchers are paid to the PHA is, of course, to bring this case within the text of section 12955, subdivision (p), which states that "source of income" means income paid directly to a tenant *or to a representative of a tenant*. We reject this argument because the facts do not support it.

2. *Section 8 Assistance Payments to the Landlord Are Not Included in the Source of Income*

Relying on authorities addressing the meaning of income for purposes of calculating child support, appellant contends that income is "any benefit received by a person that results in an increase in the aggregate amount of cash available" to the person. According to appellant, this means that Section 8 assistance payments to a landlord are included in the tenant's income.

■ This is not how section 12955, subdivision (p) defines income, i.e., source of income. " '[S]ource of income' means lawful, verifiable income

paid directly to a tenant or paid to a representative of a tenant." (§ 12955, subd. (p).) To begin with, the statute provides that source of income is income paid *directly* to a tenant. The meaning of "directly" is clear and requires no elaboration. At the outset therefore appellant's definition of income must be rejected; income under subdivision (p) is decidedly not "any benefit received by a person."

But section 12955, subdivision (p) does not stop with the sentence cited in the preceding paragraph. It goes on to provide: "For the purposes of this section, a landlord is not considered a representative of a tenant." As we have shown, this sentence was added in 2004. Appellant characterizes this as a "peripheral" amendment. We cannot agree with this; the 2004 amendment to subdivision (p) is central to this case.

Two things can be said about this addition to subdivision (p) of section 12955. First, we are, of course, bound by it. Second, this sentence is crystal clear; it requires no construction or interpretation.

■ "When statutory language is clear, judicial construction is neither necessary nor proper." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179 [96 Cal.Rptr.2d 518, 999 P.2d 706].) "If a statute's language is clear, then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 8 [255 Cal.Rptr. 412, 767 P.2d 679].) When a statute is unambiguous, its language cannot be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process. (*Bostanian v. Liberty Savings Bank* (1997) 52 Cal.App.4th 1075, 1080 [61 Cal.Rptr.2d 68], citing *West Virginia Univ. Hospitals, Inc. v. Casey* (1991) 499 U.S. 83, 98–99 [113 L.Ed.2d 68, 111 S.Ct. 1138].)

Appellant's efforts to persuade us that section 12955, subdivision (p) does not mean what it says are not persuasive.

■ First. Appellant contends that "the language of the 2004 amendment does not expressly exclude Section 8 vouchers from the definition of source of income." That of course is true but it avails appellant nothing. Section 8 vouchers are an indication of eligibility, not payments of money, and therefore vouchers are not income under any definition of income. If appellant means to say that there is nothing in the 2004 amendment that excludes from income Section 8 assistance *payments* to the landlord, appellant is wrong. Section 8 assistance payments to the landlord are not payments to a representative of a tenant. (§ 12955, subd. (p).) Hence, such payments are not a source of income for the tenant, which means that Section 8 assistance payments to the landlord *are* excluded from the tenant's "income." A simpler

way of stating the point is that Section 8 assistance payments to the landlord are not included in the tenant's income.

Second. Appellant contends that it is the PHA that is the representative of a tenant and that the Section 8 voucher is paid to the PHA. We have shown this argument to be wrong on its facts.

Third. Appellant states that a representative "is someone who acts on behalf of another" and then cites one of the introductory sections of 24 Code of Federal Regulations part 982.1 that provides: "If the PHA approves a family's unit and tenancy, the PHA contracts with the owner to make rent subsidy payments *on behalf* of the family." (24 C.F.R. § 982.1(a)(2) (2010), italics added.)[14] Appellant reasons that this means that the PHA is the representative of the tenant. But this argument leads nowhere. The PHA may or may not be the representative of the tenant; this does not convert the transfer of federal funds from HUD to the PHA into an individual tenant's income.

Fourth. Appellant states that there is "no explanation in the legislative history regarding the purpose of the landlord exception," referring to the provision that the landlord is not the representative of the tenant. Appellant offers as a "simple and practical explanation" for the 2004 amendment that it was meant to "forestall any claim that a relationship other than a traditional landlord-tenant relationship is created by the landlord's acceptance of the Section 8 voucher." This argument fails because of the italicized portions of subdivision (p) of section 12955: "(1) For the purposes of this section, 'source of income' means lawful, verifiable income paid directly to a tenant or paid to a representative of a tenant. *For the purposes of this section*, a landlord is not considered a representative of a tenant." (Italics added.) We need not entertain appellant's suggestion about the allegedly true purpose of the 2004 amendment because the Legislature made that purpose quite clear.

Fifth. Appellant asks us not to be guided by the statements of the California Apartment Association and the Western Center on Law and Poverty quoted by the Senate Judiciary Committee in its analysis of Senate Bill No. 1145 (2003–2004 Reg. Sess.) in April 2004. There is no need to turn to that committee report, as the text of section 12955, subdivision (p) is unambiguous and clear. One cannot fail to note, however, that the comments ascribed to the Western Center on Law and Poverty, which was a sponsor of Senate Bill No. 1098 (1999–2000 Reg. Sess.), by the Senate Judiciary Committee make for an ironic footnote to this case and this appeal inasmuch

---

[14] This provision is erroneously referred to in appellant's brief as 24 Code of Federal Regulations part 982.2(a)(2).

as the situation described by the Western Center's comment is at loggerheads with the viewpoint espoused by appellant and amici curiae that support appellant.[15] But, given that the statute is not ambiguous and is quite clear, it is not necessary to refer to legislative history, including the Western Center's comments.

Sixth. Appellant questions whether the 2004 amendment to section 12955, subdivision (p) is substantive, in the sense that it announces a new principle, or whether it is only a clarification of existing law. Prior to this amendment, it was possible to argue that a landlord is the representative of a tenant. The argument would not have been very convincing, since landlords and tenants tend to have antithetical interests, especially when it comes to rent. But, after the amendment, this argument is foreclosed. The 2004 amendment dispels any lingering ambiguity and therefore the amendment is one of clarification and not substance.

Appellant contends that if the amendment clarifies existing law, it cannot be read to allow landlords not to participate in the Section 8 program because, according to appellant, it is plain that Senate Bill No. 1098 (1999–2000 Reg. Sess.) "was enacted to prohibit Section 8 discrimination." We have already explained why it is incorrect to conclude that Senate Bill No. 1098 was enacted to compel landlords to participate in the Section 8 program. To claim that the 2004 amendment to section 12955, subdivision (p) operates to compel landlords to participate in the Section 8 program is to stand this amendment, and subdivision (p), on their heads. As we have shown, the operative effect of this amendment is to make clear that a Section 8 assistance payment to a landlord is not income to the tenant.

Finally, appellant contends that FEHA must be liberally construed and that reason and common sense call for the conclusion that Section 8 payments to landlords are included in the tenant's source of income. Section 8 assistance payments to landlords either are, or are not, included in the tenant's source of income. There is no room for "construction" in such a setting, especially when the Legislature has answered the question in the negative. To some, sound social policy may call for an inclusion of Section 8 assistance payments in the tenant's source of income, but so far the Legislature does not think so.

---

[15] "WCLP responds that all of the parties agreed to the language in the original bill, SB 1098, which was drafted purposefully to avoid deciding one way or the other the long running issue of whether a landlord must accept Section 8 payments." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1145 (2003–2004 Reg. Sess.) as amended Apr. 19, 2004, p. 6.)

3. *Nothing in the 1999 or 2004 Amendments Indicates That the Legislation Was Intended to Compel Landlords to Participate in the Section 8 Program*

The fact that the meaning of section 12955, subdivision (p) is plain and unambiguous is not necessarily the end of all analysis. Appellant, supported by a number of amici curiae, vigorously contends "that the underlying purpose of [Senate Bill No.] 1098 was to combat the problem of landlords arbitrarily refusing to accept Section 8 vouchers." Given this argument, we must determine whether appellant is correct and the purpose of Senate Bill No. 1098 (1999–2000 Reg. Sess.), or Statutes 1999, chapter 590, section 4, pages 4180–4182, was to compel landlords to accept Section 8 assistance payments. "Words used in a statute or constitutional provision should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters). [Citations.] [¶] But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

Guided by these principles, we must determine whether the "legislative intent apparent in the statute" is as appellant claims, i.e., whether it is apparent from the statute that the intent of the legislation was to require landlords to accept Section 8 assistance payments. We accept appellant's formulation that the statute in question is Senate Bill No. 1098 (1999–2000 Reg. Sess.) or, more accurately, Statutes 1999, chapter 590, section 4, pages 4180–4182, which enacted Senate Bill No. 1098. This said, we must also consider Statutes 2004, chapter 568, section 8, which amended the provisions found in the 1999 amendments, and which added the provision to subdivision (p) of section 12955 that the landlord is not the representative of the tenant.

There are four reasons why we do not agree with appellant about the purpose of the 1999 and 2004 amendments.

First. The 1999 and 2004 amendments address a host of problems and issues; source of income discrimination is only one of them.

Second. Although the Legislature was obviously quite aware of landlords refusing to participate in the Section 8 program, neither the 1999 nor the 2004 amendments address Section 8, i.e., title 42 United States Code section 1437f, specifically. Instead of doing so, the Legislature chose to rule out "source of income" discrimination.

■ Third. Subdivision (p) of section 12955 states that the landlord is not the representative of the tenant. The only conceivable purpose of this provision is to ensure that Section 8 assistance payments to a landlord are not considered to be the tenant's income.

Fourth. The sources cited by appellant certainly show that the Legislature was aware of landlords refusing to participate in the Section 8 program but these sources do not support the conclusion that the intent of the 1999 and 2004 amendments was to compel landlords to participate in the Section 8 program.

We address these points in the order indicated. We take up the fourth point in the following part.

The implicit suggestion in much of appellant's argument about the 1999 and 2004 amendments is that these items of legislation were focused in large part on compelling landlords to accept Section 8 assistance payments. This is not true. These comprehensive enactments address a whole host of issues and problems that do not even relate to the Section 8 program. (See fns. 6 & 12, *ante.*)

The Legislature could have specifically identified Section 8, i.e., title 42 United States Code section 1437f, and, as an example, provided that federal rent subsidy payments under section 1437f are part of the source of income, i.e., that these payments are to be considered the tenant's income.[16] Given that the Legislature was aware of landlords refusing to participate in the Section 8 program (e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Apr. 7, 1999, pp. 5–6), the Legislature could have crafted a provision along these lines that specifically identified this perceived problem. But the Legislature did not do so. Instead, the Legislature chose to prohibit "source of income" discrimination.

Nor did the Legislature leave "source of income" undefined. "Source of income" means income paid directly to a tenant or paid to a representative of

---

[16] Other legislatures have made specific provision for payments under title 42 United States Code section 1437f, as did Oregon, which enacted legislation that specifically states that such payments are not included in source of income. (Or. Rev. Stat. § 659A.421(1)(d).)

a tenant. (§ 12955, subd. (p).) Importantly, the Legislature went on to provide that, for the purposes of this section, a landlord is not considered to be the representative of a tenant. The centrality of this provision becomes at once apparent when one considers that the Legislature could just as easily have provided that, for the purposes of this section, a landlord *is* the representative of the tenant. The decision to do the exact opposite, i.e., to state that the landlord is *not* the tenant's representative, speaks quite clearly about legislative purpose. That is, given the awareness about the problem, the Legislature chose not to enact legislation that would have effectively compelled landlords to accept Section 8 assistance payments.

In sum, there is nothing on the face of the legislation that suggests that it was the purpose and intent of the Legislature to compel landlords to participate in the Section 8 program. The same conclusion follows upon a consideration of the legislative history that appellant and amici curiae cite; we turn to this subject next.

4. *The Legislative Committee Materials Cited by Appellant and Amici Curiae Do Not Show That the Purpose of the 1999 and 2004 Amendments Was to Compel Landlords to Participate in the Section 8 Program*

Appellant's citation of the Senate Judiciary Committee, Office of Senate Floor Analyses, third reading analysis of Senate Bill No. 1098 (1999–2000 Reg. Sess.) as amended April 7, 1999, pages 5–6 is highly selective and even misleading.

It begins with appellant deleting the phrase "[p]roponents contend that," which precedes the sentence "this form of discrimination is creating tremendous hardships for the disabled and the elderly, who now find that they are being lawfully discriminated against because they are recipients of Section 8 assistance." The deletion makes it appear as if the rest of the sentence is a legislative finding, which is not true. This is a tactic also adopted by one amicus curiae, which, in addition to deleting "[p]roponents contend that," goes so far as to boldface and italicize "this form of discrimination is creating tremendous hardships for the disabled and the elderly." We think that deleting "[p]roponents contend that," a practice appellant continues in her reply brief, and presenting the remainder of the sentence as a legislative finding is misleading.

Also misleading is appellant's omission of the preface to the comment, which is that the comment addresses proposed subdivision (n), now subdivision (*o*) of section 12955. That provision requires the landlord to determine eligibility in terms of the actual rent paid by the renter, when there

is a government rent subsidy. But, rather than state the provision the comment actually addressed, appellant prefaces the quote by stating "[a]s the Senate Judiciary Committee's analysis makes clear, the express purpose of [Senate Bill No.] 1098 (as amended April 7, 1999) was the protection of Section 8 tenants." The suggestion, made explicitly a little later in appellant's brief, is that what the Legislature meant by source of income discrimination is in fact "Section 8 discrimination."

This is a mischaracterization of the Senate Judiciary Committee's comment. The comment supplied the reason for the enactment of proposed subdivision (n), now (*o*) of section 12955. Evidently, in order to turn away Section-8-eligible tenants, landlords would determine eligibility in terms of the entire rent due, and not the portion of the rent to be paid by the renter. The committee notes that the general background for this practice is "the growing trend among landlords to flatly refuse to rent to anyone on Section 8 housing" but the committee's comment does *not* go on to say that this trend has to be reversed by compelling landlords to participate in the Section 8 program. That is, while the comment decries the practice of some landlords to turn away or even evict Section 8 tenants, the comment proposes only the measure taken by proposed subdivision (n), now (*o*), of section 12955, *and not anything more.*

As a final word about this particular committee analysis, it certainly shows that the Legislature knew, and presumably still knows, that there are landlords who refuse to participate in the Section 8 program and that this poses an obvious problem for persons dependent on Section 8 assistance payments. But being aware of a problem is not the same as doing something about it. In fact, as our analysis of the 2004 amendment to section 12955, subdivision (p) shows, the Legislature has not acted to compel landlords to participate in the Section 8 program.

Appellant's citation to the analysis of the Assembly Committee on Appropriations of Senate Bill No. 1098 (1999–2000 Reg. Sess.) as amended July 8, 1999, page 2 is also misleading. It simply is not true, as appellant contends, that this document shows that this committee "recognized the importance of Section 8 to [Senate Bill No.] 1098 generally as 'a modest effort to address some of the issues affecting low-income renters.' " The cited comment deals with an aspect of rent control and only marginally with Section 8. That is, it addresses the issue whether the tenant has vacated voluntarily when the landlord terminates the Section 8 HAP contract and the tenant must vacate because he or she cannot afford the rent without the subsidy. If anything, the comment supports the view that the landlord is free to terminate the HAP contract with the PHA.

Appellant refers us to a letter by the Legislative Counsel, dated June 2, 2000, that states that Section 8 assistance payments are included in the source of income. This letter does not address the 2004 amendment that added to subdivision (p) of section 12955 the provision that the landlord is not the tenant's representative. In any event, the opinions of the Legislative Counsel are not binding (*North Hollywood Project Area Com. v. City of Los Angeles* (1998) 61 Cal.App.4th 719, 724 [71 Cal.Rptr.2d 675]), and, in light of the date of the letter, the opinion is not even persuasive.

Appellant also cites from a Senate Judiciary Committee comment on the analysis of Senate Bill No. 1730 (1997–1998 Reg. Sess.) as amended April 13, 1998, which was a predecessor to Senate Bill No. 1098 (1999–2000 Reg. Sess.). We note that this comment is much like that made by the Senate Judiciary Committee on the analysis of Senate Bill No. 1098, as amended on April 7, 1999, but we see no purpose in considering historical materials relating to a bill that was not enacted. This certainly sheds no light on the purpose of the 1999 and 2004 amendments, which is the issue that we address.

In her reply brief, appellant states that there is "simply nothing in the legislative record of [Senate Bill No.] 1098" to challenge the conclusion that the Legislature intended in that bill to eradicate "Section 8 discrimination." We put this point differently. While the Legislature was clearly aware of the fact that some landlords refuse to participate in the Section 8 program, there is nothing in the record to suggest that the Legislature intended in either the 1999 or the 2004 amendments to enact legislation that would have compelled landlords to participate in the Section 8 program.

Amicus curiae points to the fact that FEHA prohibits source of income discrimination in a variety of housing contexts, referring to provisions prohibiting harassment because of source of income (§ 12955, subd. (a)), denying access to a multiple listing service because of source of income (§ 12955, subd. (j)) and using restrictive covenants predicated on source of income (§ 12955, subd. (*l*)). Amicus curiae contends that "carving out Section 8 housing assistance payments from the definition of 'source of income' would lead to the impermissible conclusion that the [L]egislature intended to exclude Section 8 households from the above protections." Amicus curiae also stresses that FEHA, as well as the Unruh Civil Rights Act, must be liberally construed.

The foregoing overlooks what the Legislature has actually done—or not done. Stray comments in one, two or even three committee analyses amid dozens of studies and reports, especially when quoted out of context, do not add up to the conclusion that the Legislature intended to compel landlords to

accept Section 8 assistance payments, i.e., that the Legislature intended to prohibit "Section 8 discrimination," to use appellant's, and amicus curiae's, phrase. The most that the sources cited by appellant and amici curiae show is that the Legislature knows that there are landlords who will not participate in the Section 8 program. It is surely significant that, *knowing this*, the Legislature's only response was to enact a provision that, when it comes to receiving income, the landlord is not the representative of the tenant.

■ This is not to say that section 12955 does not go a long way in prohibiting source of income discrimination. As the court noted in *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1414–1415 [60 Cal.Rptr.3d 719], section 12955 prohibits source of income discrimination in no less than nine settings, only one of which is the one at issue here, i.e., the setting when "the potential discriminatee is a tenant or potential tenant and the potential discrimination arises out of efforts to seek rental housing." (*Sisemore, supra*, 151 Cal.App.4th at p. 1416.) (*Sisemore* does not involve a tenant-rental housing setting.) We agree with the conclusions of the *Sisemore* court that section 12955 "appears on its face to provide broad protection against source-of-income discrimination in a variety of housing contexts, and not simply to landlord-tenant situations" (*Sisemore*, at p. 1414) and that section 12955, subdivision (p)(1)'s definition of source of income discrimination is limited to situations when the potential discriminatee is a tenant or potential tenant and the potential discrimination arises out of efforts to seek rental housing (*Sisemore*, at p. 1416).

■ In conclusion, we find no indication that the purpose of the 1999 and 2004 amendments is to compel landlords to participate in the Section 8 program. The only indication of any legislative purpose on this issue is to the contrary; this is the provision in subdivision (p) of section 12955 that the landlord is not the tenant's representative. While we appreciate that in other jurisdictions some courts have concluded that, as far as source of income discrimination is concerned, Section 8 assistance payments should be included in the tenant's income, we must address what the California Legislature has enacted and that, in our opinion, excludes Section 8 assistance payments from the tenant's income.

We recognize that the Section 8 program serves, and has served, important public interests and that it reflects a broad consensus about a number of housing issues. It is also clear that a landlord's refusal to participate in the Section 8 program necessarily has a negative effect on the program, and that it impacts negatively on persons who are in need of the benefits of the program. But questions of social policy are not for us to debate and they are certainly not for us to resolve. This is for the Legislature to do. We must confine ourselves to applying the law that the Legislature has enacted. And that

law is clear; the landlord is not the representative of the tenant and therefore payments to the landlord are not included in the tenant's source of income.

### 5. *Respondents Did Not Violate the Unruh Civil Rights Act*

Subdivision (b)(3)(B) of Civil Code section 54.1 provides: "Any person renting, leasing, or otherwise providing real property for compensation shall not refuse to make reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises."

■■■ This provision is largely identical to one found in title 42 United States Code section 3604. This federal law prohibits discrimination in the sale or rental of housing. Title 42 United States Code section 3604(f)(3)(B) defines discrimination as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

Addressing title 42 United States Code section 3604(f)(3)(B), the court in *Smith & Lee Associates v. City of Taylor, Mich.* (6th Cir. 1996) 102 F.3d 781[17] held that the "statute links the term 'necessary' to the goal of equal opportunity. *See* 42 U.S.C. § 3604(f)(3)(B) ('accommodation . . . necessary to afford . . . equal opportunity'). Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." (*Smith & Lee Associates v. City of Taylor, Mich.,* supra, at p. 795, cited in *Giebeler v. M & B Associates* (9th Cir. 2003) 343 F.3d 1143, 1155.) Or, as another court has put it, "the concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." (*Bonk v. Ineichen* (7th Cir. 1995) 54 F.3d 425, 429.) There must be a causal link between the defendant's policy and the plaintiff's injury. (*Giebeler v. M & B Associates, supra,* at p. 1155.)

It is not disputed that appellant resides in the apartment she rents from respondents. In fact, it affirmatively appears from the record that appellant and her family desisted from relocating elsewhere because the accommodations she has suit her needs. In other words, there is no interference with appellant's use and enjoyment of the premises that she is renting.

Appellant claims that respondents' refusal to accept Section 8 assistance payments interferes with her use and enjoyment of the apartment. Conceding

---

[17] When state law is identical or similar to federal legislation, federal decisions are a guide to the interpretation of state law. (*Douglas v. State of California* (1942) 48 Cal.App.2d 835, 838 [120 P.2d 927].)

that there is no authority that so holds, appellant claims that because she is unable to "independently afford her rent," respondents' refusal to accept Section 8 assistance payments interferes with her use and enjoyment of the property. Putting this somewhat labored argument another way, appellant states that the question is whether a disabled person's equal opportunity to use and enjoy her home under subdivision (b)(3)(B) of Civil Code section 54.1 "can be interfered with by a property owner's failure to make an exception to a policy that would alleviate financial impediments to living at the property."

This is a dysfunctional argument at several levels. To begin with, it appears to be obvious that a person who concededly has the full use and enjoyment of the premises cannot claim, in the next breath, that her use and enjoyment is curtailed. Next, the suggestion that a tenant's *awareness* that the landlord will not accept Section 8 assistance payments interferes with the tenant's use of the premises is untenable. The tenant either has, or has not, use and enjoyment of the premises; whether the tenant is happy or unhappy is another question that is not subsumed under use and enjoyment. Finally, appellant cannot show that, *but for the accommodation*, she is likely to be denied an equal opportunity to enjoy the premises. If respondents would "accommodate" appellant by accepting Section 8 assistance payments, she would be exactly in the same position that she is in today. In other words, the "accommodation" certainly is not necessary.

In sum, it is foundational to a claim under subdivision (b)(3)(B) of Civil Code section 54.1 that the rules, policies, practices, or services in question actually impinge on the tenant's use and enjoyment of the premises. Because it is undisputed that that is not true of appellant's use and enjoyment of her apartment, the trial court was correct in granting the motion for nonsuit.

Our holding on this issue does not require us to address appellant's claim that the trial court erred in granting the motion for nonsuit because it concluded that appellant had physical access to the apartment. We review the ruling and not the reason for the ruling. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

We add here two observations that may be of interest in future cases. As we discuss below, the sole cause of action that went to the jury was that FEHA required respondents to reasonably accommodate appellant's request as a disabled person that respondents accept Section 8 assistance payments to cover part of her rental; in other words, this was the FEHA disability cause of action. But appellant's Unruh Civil Rights Act, Civil Code section 54.1, action also claimed that respondents should have accommodated appellant's request and that they should have accepted Section 8 assistance payments. It strikes us that these causes of action are in substance identical, at least as they

were presented in this case. We strongly doubt that appellant could have recovered on both causes of action. Our second point is that there is potentially a relationship between a FEHA claim and the Unruh Civil Rights Act by virtue of Government Code section 12993, subdivision (a), which we set forth in the margin.[18]

### 6. *There Was No Error in the Jury Instructions*

The jury was given the following special instruction: "In reaching your verdict you must not consider whether plaintiff's children have been paying, or are able or willing to pay her rent. Whether or not plaintiff's children have been paying or are able or willing to pay her rent is totally irrelevant. [¶] However, you may consider plaintiff's children's payment of the rent as to the existence and reasonableness of plaintiff's emotional distress damages. [¶] In reaching your verdict you must not consider the income or assets of plaintiff's children, which is totally irrelevant."

This instruction was given at appellant's request. The instruction as given differed, however, from the original instruction proposed by appellant. The proposed instruction contained the words "or otherwise obligated" after the word "willing" in the first and second sentences of the instruction. The first and second sentences of the proposed instruction would have read: "In reaching your verdict you must not consider whether plaintiff's children have been paying, or are able, willing or otherwise obligated to pay her rent. Whether or not plaintiff's children have been paying or are able, willing or otherwise obligated to pay her rent is totally irrelevant."

Appellant contends it was prejudicial error to omit "or otherwise obligated" from the instruction.

The case went to the jury on the theory that FEHA required respondents to reasonably accommodate appellant's request as a disabled person and accept Section 8 assistance payments to cover part of her rental. The jury was fully instructed on the elements and components of reasonable accommodation law.

Appellant points to the fact that respondents argued to the jury that appellant's sons were on the lease as lessees, even though they no longer

---

[18] "The provisions of this part shall be construed liberally for the accomplishment of the purposes of this part. Nothing contained in this part shall be deemed to repeal any of the provisions of the Civil Rights Law or of any other law of this state relating to discrimination because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, *unless those provisions provide less protection to the enumerated classes of persons covered under this part.*" (Gov. Code, § 12993, subd. (a), italics added.)

lived there, and that her sons were therefore obligated to pay the rent. Appellant contends that the jury "likely believed that Appellant did not need the accommodation because her children were contractually obligated to pay the rent."

If the lease were in its infancy, this argument might be plausible. But, at the time of trial, appellant had been living at this apartment for 17 years. That her sons were still "obligated" under the lease was of no moment. We explain why this is so.

There were three facts or circumstances that were critical. First, appellant had lived there for 17 years. Second, the jury was clearly instructed that they were not to consider whether her sons "have been paying or are able or willing to pay her rent." Third, the jury was instructed that an accommodation is "necessary" if "without the accommodation, a landlord's rules, policies or practices interfere with a disabled person's right to use and enjoy their dwelling."

Given that the jury was instructed to disregard any financial assistance from appellant's sons, the fact was that she had been living there for 17 years, i.e., she evidently managed to pay the rent for a considerable period of time. The great stumbling block to appellant's case was just that: the requested accommodation was evidently not necessary.

Appellant continued to live in the apartment she rented from respondents not because her sons were "obligated" on the lease, but because she continued to meet her obligations under the lease. This is why it is of no moment whether or not her sons were still obligated under the lease.

The critical aspect of the instruction about appellant's children was to disregard them as a source of financial support. This necessarily subsumed the point that they continued as lessees under the lease. If the jury disregarded whether the sons paid the rent, or were able or willing to pay the rent, it certainly made no difference at all whether the sons were listed as lessees: the point was that the sons' roles as sources of financial support were to be ignored as irrelevant. This is yet another reason why it was not erroneous to omit "or otherwise obligated" from the instruction.

While appellant expends considerable energy on justifying this instruction as a "collateral source limiting instruction," we think it is pointless to engage in a debate over whether, as a general proposition, a collateral source instruction is appropriate in the factual setting of this case. The fact of the matter is that the trial court gave the instruction as requested by appellant, with the modification that we have discussed above. Even as modified, the

instruction certainly favored appellant; we express no opinion about whether the instruction should have been given. In any event, it is of no moment whether this was, or was not, a collateral source instruction.

██ Finally, in a footnote, appellant claims that the court should have instructed the jury that an accommodation is necessary if it would enhance the disabled person's quality of life by ameliorating the effect of the disability. Footnotes are not the appropriate vehicle for stating contentions on appeal. (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 160 [35 Cal.Rptr.3d 745].) "We do not have to consider issues discussed only in a footnote." (*Ibid.*) The rules require points on appeal to be stated under a separate heading summarizing the point. (Cal. Rules of Court, rule 8.204(a)(1)(B).) Be that as it may, appellant wholly fails to point to any facts that would have warranted this instruction.

## 7. *Respondents' Claims of Errors Are Disregarded*

Respondents contend that the trial court erred in excluding evidence showing that appellant was not actually entitled to Section 8 assistance payments, and that the court also erred in excluding evidence that would have shown that the Section 8 program would have imposed substantial burdens on respondents. In addition, respondents claim that the Donald T. Sterling Corporation should have been dismissed from the case, as it was not shown that the corporation had any involvement with this case.

██ An appeal may be taken only by a party who has standing to appeal. (*United Investors Life Ins. Co. v. Waddell & Reed, Inc.* (2005) 125 Cal.App.4th 1300, 1304 [23 Cal.Rptr.3d 387].) This rule is jurisdictional. (*Ibid.*) Only a party who is aggrieved has standing to appeal. (*Ibid.*) A party is aggrieved only if its "rights or interests are injuriously affected by the judgment." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 [97 Cal.Rptr. 385, 488 P.2d 953].) Respondents completely prevailed in the trial court; they are obviously not aggrieved by the judgment. Since they have no standing to appeal from the judgment, we must disregard their contentions, and we do so.

Appellant has filed a motion to dismiss respondents' cross-appeal on the theory that respondents' complaints about the trial court's rulings, which we decline to address, are really in the nature of a protective, conditional cross-appeal. But, because respondents did not in fact file a notice of appeal, there is no such appeal to dismiss. Accordingly, appellant's motion to dismiss the cross-appeal is denied.

## DISPOSITION

The judgment is affirmed. Because respondents did not file a notice of appeal, appellant's motion to dismiss the cross-appeal is denied as moot. Respondents are to recover their costs on appeal.

Bigelow, P. J., and Lichtman, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.