Filed 7/22/22  K.B. v. G.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| K.B., | C094762 |
| Plaintiff and Respondent, | (Super. Ct. No. STA-FL-LSWC-2019-0004028) |
| v. | |
| G.B., | |
| Defendant and Appellant. | |

This is a child custody case involving a request by one parent to move across the country with the child.  In 2019, Karen B. and Gregory B. separated after 20 years of marriage.[1]  Karen was awarded temporary primary physical custody of their daughter CC.  In 2020, Karen filed a so-called move-away request, seeking permission to move

---

[1] In order to protect the privacy interests of a child in a custody proceeding, we refer to the parties by their first names.  (Cal. Rules of Court, rule 8.90.)

from California to North Carolina with CC.[2] Gregory (Greg) opposed the request. His primary argument (both in the trial court and here) is that if CC moves to North Carolina, Karen will alienate CC from him and will not support their relationship.

Following a five-day trial, and in agreement with the recommendations of a court-appointed custody evaluator, the court granted Karen's request and awarded her primary physical custody of CC. Greg thereafter filed a motion for reconsideration and/or a new trial, which the court denied.

Greg filed a timely notice of appeal, and now raises three arguments: (1) the trial court abused its discretion in granting Karen's move-away request; (2) the trial court erred in refusing to admit an audio recording of an argument between Greg and Karen; and (3) the trial court abused its discretion in denying his motion for reconsideration and/or a new trial. For the reasons stated below, we disagree, and we thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The following is an abbreviated version of the facts.[3] Additional facts are provided in the relevant discussion sections, below.

Greg and Karen married in 1999 and had three children: twins William and Virginia, born in 2003, and CC, born in 2009. The family lived in Stockton. Greg is a doctor, and Karen is an attorney. Greg worked full-time and frequently traveled for speaking engagements and medical meetings. Karen worked half-time or less in order to spend more time with the children.

---

[2] "[T]he term 'move away request' refers to a parent's request to move the residence of the child and/or children, *not* a request by the parent to move his or her own residence." (*Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1119, fn. 1 (*Mark T.*).)

[3] Many of the facts come from the trial court's final statement of decision in this case. Although Greg disagrees with the trial court's ultimate conclusion, he does not challenge many (if any) of its factual findings.

Karen filed for legal separation in July 2019, and sought sole custody of the children; Greg responded by filing for dissolution and seeking joint custody. At the time of the separation, William and Virginia were 16, and CC was 9. By the time of trial, William and Virginia were 17, were seniors in high school, and were planning on attending college in North Carolina; CC was 11 and was in fifth grade.

We note at the outset that *all* parties agree Karen and Greg's separation was acrimonious. In the words of the trial court, "The parents in this case have each taken irreconcilable positions, and have repeatedly demonstrated unwillingness to compromise and agree on matters that concern the best interests of [CC]," and "neither parent [has] take[n] the steps necessary to reduce conflict in the situation in which they now find themselves." Like the trial court, however, we agree that we do not need to "attempt to unravel [the] reasons for the [parents'] bitterness to one another" in order to decide this appeal.

In October 2019, following an attempt at mediation, the court awarded temporary legal custody of the children to Karen and Greg, and temporary physical custody of the children to Karen; the court also ordered visitation with Greg on alternate weekends and every Tuesday afternoon. William and Virginia were permitted to opt out of visitation; CC was not. Greg's visitation schedule with CC was thereafter modified several times, generally to give him more visitation.

The court's October 2019 order also required the children to attend therapy with Peter Sheppard, a licensed marriage and family therapist, with the goal of repairing their relationship with Greg. Sheppard met with Virginia and William (separately) at least six times each, and with CC thirteen times. He also met with Karen and Greg individually.

At Greg's request, the court also appointed Sidney Nelson, Ph.D., to serve as an independent custody evaluator.

In February 2020, the court, on its own motion, appointed counsel to represent CC's best interests.

3

Sometime around the summer of 2020, Karen decided she wanted to move to North Carolina, where she was originally from, where her parents and siblings still lived, and where William and Virginia planned on attending college. She thus filed a move-away request, seeking an order allowing her to move CC with her to North Carolina. Dr. Nelson's evaluation was expanded to include an analysis of the move-away issue.

Dr. Nelson completed his evaluation in December 2020, and prepared a lengthy written report. As part of his evaluation, he interviewed Karen and Greg both individually and together, performed psychological testing on them, and observed them (separately) with CC. He also interviewed William and Virginia once and CC twice and conducted 13 collateral interviews with individuals who had information relevant to his evaluation, including Sheppard, the children's court-appointed therapist, and several other therapists who saw Karen and Greg either individually or as a couple.

Based on his evaluation, Dr. Nelson acknowledged there was a risk that Karen would contribute to CC becoming alienated from Greg if the move-away request was granted. In his opinion, Karen's greatest weakness as a parent was that she was "cavalier" about the importance of the children maintaining a relationship with Greg and had not done enough to ensure the children maintain that relationship. He gave one example: in September 2019, Karen included Virginia and William on text messages to Greg discussing him and their divorce in a hostile way.[4] In Dr. Nelson's opinion, it was "extremely inappropriate" to include the children on this type of communication, and "would probably result in William and Virginia having a very negative view of their father." Dr. Nelson also stated, "Although Karen denies this, it appears to me that she

---

[4] The text messages state, "Greg - you filed for divorce and a custody trial. You alone want this. I moved here to have a life, be your wife and family forever with you. Saying you didnt [sic] want to file this but signed it is not truthful." And, "Marriage actually means something to me and the kids. And so does commitment. You are the only person who is throwing it away."

has very much contributed to the older children's strong resistance to having a normal and healthy relationship with their father."

Dr. Nelson nonetheless concluded it was in CC's best interest to remain in Karen's primary physical custody after she moves to North Carolina. In Dr. Nelson's opinion, CC has a positive relationship with both parents and is not estranged or alienated from either. However, Karen has always been CC's "main caretaker," CC "has a stronger and more secure attachment with her mother" than with her father, and Karen's home is CC's " 'comfort zone.' " The advantages to CC of moving to North Carolina are that "she would continue to be with the parent with whom she has a strong attachment," and she "would be living with the parent whose care and support of her has been consistent and unwavering." Moving to North Carolina "would also be consistent with [CC's] wishes that she spends most of her time in her mother's care." Finally, Dr. Nelson had a "significant concern" about "the risk of [CC] developing emotional difficulties which would negatively impact her day to day functioning if she is separated from her mother for much of the year."

A five-day trial on Karen's move-away request was held in May 2021. Ten witnesses testified: Karen; Greg; Dr. Nelson; Leslie M. Drozd, Ph.D, an expert retained by Greg to rebut Dr. Nelson's findings; Greg's mother Sharon; and five friends of Karen and Greg (James Farrell, Gregory Dohrmann, Lisa Conway, David Rishwain, and Gina Rishwain). Dr. Drozd's testimony focused on the risk that Karen would alienate CC from Greg if the move-away request was granted. The parties stipulated to the admission of deposition testimony from Peter Sheppard, the children's court-appointed therapist, and Dan Wilson, a marriage counselor who had 10 to 15 sessions with Greg and Karen.

Following the trial, CC's court-appointed counsel filed a brief recommending that Karen be awarded primary physical custody of CC. Her recommendation largely followed Dr. Nelson's.

On July 27, 2021, the trial court issued a final statement of decision granting Karen's move-away request and awarding her primary physical custody of CC. After discussing the factors identified in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*), the court concluded as follows: "The Court finds that any attempt by . . . Mother to alienate has been minimal and [has] been unsuccessful in that [CC] has an excellent relationship with her Father even after two and one-half years of separation. . . . The Court agrees with Dr. Nelson that parental alienation is a concern, but that concern does not outweigh the greater risk of mental trauma which would be caused to not allow [CC] to primarily live with her mother who has always been her primary caretaker."[5] A final order was entered on August 10, 2021.

On or about August 7, 2021, after the final statement of decision was issued and before the final order was entered, Karen moved to North Carolina and took CC with her. This precipitated a fight between Karen and Greg over the applicability of Code of Civil Procedure section 917.7, which provides that a custody order that allows the removal of a minor child from the state is stayed by operation of law for 30 days. The result of this dispute was that CC had to return to Stockton during this 30-day period and miss the first month of her new school in North Carolina.[6] This resulted in CC texting Greg "I hate you" and "Your [*sic*] the worst dad."

On August 20, 2021, Greg filed a motion for reconsideration of the final order and/or a new trial. The motion was based on "new evidence" concerning events that occurred after the trial, with a focus on events surrounding CC's move to North Carolina on August 7.

---

[5] Greg was awarded visitation as follows: one weekend a month (and up to one week if he has the time) in North Carolina; fall and winter school breaks and the majority of time during the summer break; and alternating Thanksgiving, Christmas and Easter breaks.

[6] While in Stockton, she attended school in North Carolina using remote means.

6

On August 30, 2021, Greg filed a timely notice of appeal from the August 10, 2021 final order.

On October 19, 2021, the trial court denied Greg's motion for reconsideration and/or new trial.[7]

## DISCUSSION

Greg raises three arguments on appeal: (1) the trial court abused its discretion in granting Karen's move-away request; (2) the trial court erred in refusing to admit an audio recording of an argument between Greg and Karen; and (3) the trial court abused its discretion in denying his motion for reconsideration and/or a new trial. We disagree on all counts.

---

[7] Karen argues the trial court lost jurisdiction to consider the motion for reconsideration when Greg filed a notice of appeal. We disagree. Karen's argument is based on Code of Civil Procedure section 916, which provides, "*Except as provided in Sections 917.1 to 917.9*, . . . the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon matters embraced therein or affected thereby, . . . but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a), italics added.) Karen acknowledges "a motion for a new trial is collateral to the judgment and may proceed despite an appeal from the judgment." (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 50.) But she fails to acknowledge Code of Civil Procedure section 917.7, which provides, "The perfecting of an appeal shall not stay proceedings as to those provisions of a judgment or order which award, change, or otherwise affect the custody . . . of a minor child." Accordingly, "the trial court . . . in spite of the appeal [has] the discretionary power to make, vacate and modify custody orders." (*Mancini v. Superior Court* (1964) 230 Cal.App.2d 547, 554.) Because Greg's motion for reconsideration asked the court to modify a custody order, his appeal did not divest the trial court of jurisdiction.

# I

## *The Move-away Request*

### A.      *Standard of Review*

"The standard of appellate review of custody . . . orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*).)  " 'A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law*, an abuse of discretion is shown—i.e.,—where, considering all the relevant circumstances, the court has "exceeded the bounds of reason" or it can "fairly be said" that no judge would reasonably make the same order under the same circumstances.' " (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480.)  " '[E]ven if we disagree with the trial court's determination, we uphold the determination so long as it is reasonable.' " (*S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 333.) " ' " 'The trial judge, having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony.' " ' " (*Id.* at p. 334.)  " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319.)  "We accept as true all evidence tending to establish the correctness of the trial court's findings, resolving every conflict in the evidence in favor of the judgment." (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 702.)

Given this deferential standard of review, it is not surprising that our Supreme Court has noted reversal in move-away cases is infrequent and ordinarily involves unusual circumstances.  (*LaMusga, supra*, 32 Cal.4th at p. 1092.)

Although our review is deferential, it is not toothless. As Greg correctly notes, an "order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order." (*Mark T., supra*, 194 Cal.App.4th at pp. 1124-1125.)

### B.  Relevant Law

As courts have recognized, move-away cases often involve "heart-wrenching circumstances" that "would challenge the wisdom of King Solomon," (*LaMusga, supra*, 32 Cal.4th at pp. 1091, 1101), and "there is frequently no solution that is fair to everyone involved," (*In re Marriage of Bryant* (2001) 91 Cal.App.4th 789, 794 (*Bryant*)).  This case is no different.  As the trial court aptly recognized, "Move-away cases are always difficult."

Move-away cases are even more difficult when the move is a long distance one, as in this case.  Although the law recognizes it is in the best interests of the child to have "frequent and continuing contact with both parents," (Fam. Code, § 3020, subd. (b)),[8] joint custody and frequent contact are not feasible if the parents will be living on opposite sides of the country, and the trial court is in the unenviable position of choosing one parent to be the primary custodial parent.  Lest one be tempted to suggest that the moving parent should simply stay put, the law teaches otherwise, and "the court must proceed on the assumption that the parent will in fact be moving, and must fashion a custody order that is in the best interests of the minor accordingly."  (*Mark T., supra*, 194 Cal.App.4th at p. 1120; see also *Bryant, supra*, 91 Cal.App.4th at p. 794 ["That the move of a custodial parent may have an adverse effect on the frequency of contact by the noncustodial parent is not by itself determinative.  What is determinative is the best interest of the children, given that one parent is moving and the other is not"].)

---

[8] Undesignated statutory references are to the Family Code.

Moreover, the moving parent is *not* required to show the move is necessary or even wise. (*Burgess, supra*, 13 Cal.4th at p. 36.) As our Supreme Court explains, "ours is an increasingly mobile society," and "it is unrealistic to assume that divorced parents will permanently remain in the same location after dissolution or to exert pressure on them to do so." (*Id.* at pp. 35-36; see also *LaMusga, supra*, 32 Cal.4th at p. 1098 [court "must not" issue order that effectively coerces parent to abandon plans to relocate, i.e., by transferring custody to other parent unless relocation plan is abandoned].)

The focus in all custody cases, including move-away cases, is on the " 'best interest of the child.' " (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 955 (*Brown*); § 3040; see also §§ 3011, 3020.) When making an initial custody determination, including one that involves a move-away request, "the trial court has 'the widest discretion to choose a parenting plan that is in the best interest of the child.' (Fam. Code, § 3040, subd. (b).) It must look to *all the circumstances* bearing on the best interest of the minor child." (*Burgess, supra*, 13 Cal.4th at pp. 31-32.) It must consider the health, safety, and welfare of the child; any history of abuse by one parent against the child or the other parent; and the nature and amount of the child's contact with the parents. (*Id.* at p. 32, quoting § 3011.) These factors are not exclusive, and the court may consider any other factors it finds relevant. (§ 3011, subd. (a).)

In *LaMusga*, our Supreme Court instructed that trial courts "ordinarily should consider" the following factors in move-away cases: the child's interest in stability and continuity in the custodial arrangement; the distance of the move; the child's age; the child's relationship with both parents; the relationship between the parents, including, but not limited to, their willingness to put the child's interests above their own; the child's wishes if the child is mature enough for this inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently share custody. (*LaMusga, supra*, 32 Cal.4th at p. 1101; accord, *Brown, supra*, 37 Cal.4th at pp. 960-961.) These factors are frequently referred to as the *LaMusga* factors. They are nonexclusive, and the

court may consider other factors bearing on the child's best interest. (*Jane J. v. Superior Court* (2015) 237 Cal.App.4th 894, 905 ["list of factors is not exhaustive"].) Our Supreme Court also instructs that "[t]he weight to be accorded to such factors must be left to the court's sound discretion." (*LaMusga*, at p. 1093.)

Finally, our Supreme Court has repeatedly emphasized that "this area of law is not amenable to inflexible rules. Rather, we must permit our superior court judges—guided by statute and the principles we . . . affirm in the present case—to exercise their discretion to fashion orders that best serve the interest of the children in the cases before them." (*LaMusga, supra*, 32 Cal.4th at p. 1101.) And again: "[B]right line rules in this area are inappropriate: each case must be evaluated on its own unique facts." (*Burgess, supra*, 13 Cal.4th at p. 39.)

### C.    Analysis

### i.    CC's Relationship with her Parents

We start with the trial court's conclusion in this case—namely, that it is in CC's best interest to remain in the primary physical custody of Karen, because Karen has always been CC's primary caretaker, and because CC has a stronger bond with Karen than with Greg.

California courts "have repeatedly emphasized" that "the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining ongoing custody arrangements." (*Burgess, supra*, 13 Cal.4th at pp. 32-33; see also *LaMusga, supra*, 32 Cal.4th at p. 1093 [same].) Whenever a trial court makes a custody order, be it an initial custody order or a change in an existing order, "a paramount concern is the need for stability and continuity in the life of a child, and the harm that may result from disruption of established patterns of care and emotional bonds." (*Ragghanti v. Reyes* (2004) 123 Cal.App.4th 989, 999.) "A custody determination must be based upon a true assessment of the emotional bonds

11

between parent and child," and "must reflect also a factual determination of how best to provide continuity of attention, nurturing, and care." (*Burchard v. Garay* (1986) 42 Cal.3d 531, 540.) "When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child." (*Id.* at p. 538, fn. omitted.) In this case, the trial court found that Karen has always been CC's primary caretaker, that CC has a stronger attachment to Karen than to Greg, and that it is thus in CC's best interest to remain in the primary custody of Karen. It acted well within its discretion in so finding.

For example, the trial court found Karen "has been [CC's] main caretaker and primary parent for her entire life, and [CC] is most accustomed to being with her mother and relying on her mother to make parenting decisions in her best interests." And again: Karen is "the parent whose care and support of [CC] has been most consistent and unwavering. It has been [Karen] who has been more involved with the children on a consistent basis than [Greg] during their lives." And again: "[Karen] has always been [CC's] primary caretaker. This has been true throughout her life." And again: "[Karen] was by a wide margin the primary caretaker of [CC]."

The trial court also found that CC has a "stronger attachment" to Karen than to Greg, which is not surprising given that Karen has always been the primary caretaker and worked part-time in order to spend more time with the children, while Greg worked full-time. The trial court thus found: "[CC] has always had a closer relationship to her mother." And again: "[CC] is strongly bonded to her mother." And again: "[CC's] therapist Mr. Sheppard agreed that [CC] is very close to her mother, and that mother's home is [CC's] 'comfort zone.' " And again: "[CC] 'yearns' for her mother." And again: CC "would like to remain primarily in the custody of [Karen]."

Substantial evidence supports the trial court's findings.

Dr. Nelson made similar findings on these issues. In particular, Dr. Nelson found CC "has a stronger and more secure attachment to her mother," Karen "has always functioned as the children's primary parent and caretaker," CC "is accustomed to being with her mother primarily and relying on her mother to make parenting decisions and act in her best interest," CC is " 'very close' " to her mother and her mother's home is CC's " 'comfort zone,' " CC "has a stronger attachment and affinity for her mother," and CC "expressed a strong desire to live in North Carolina if her mother made the decision to move there."

Additionally, when Dr. Nelson asked CC who she would prefer to talk to if she were scared, worried, or happy, she stated she would prefer to talk to her mother or her sister if she were worried or happy, and she would " 'definitely' " prefer to talk to her mother if she were scared.

Dr. Nelson's testimony at trial included the following: "I think [CC] has a positive relationship with both of her parents. She clearly has a much stronger affinity for her mother, though. That was indicated to me in her interview with me and also not only in what she said but really how she says it. Like when you just read the words on a report, [CC] says she would like to live with her mother in North Carolina if her mother moves, that really doesn't tell the whole story. Because you lose . . . the tone in her voice and her level of enthusiasm and how she says things. She really has a very strong affinity for her mother. And she not only wants to live with her, she yearns to be with her mother. [¶] . . . [¶] . . . She yearns to be with her mother. And that doesn't really come forth in a written report. That's what's significant to me."

As noted, Dr. Nelson found Greg has a strong bond and a "positive and healthy relationship" with CC, and the trial court agreed. On balance, however, Dr. Nelson was of the opinion that "the benefits to [CC] of being in her mother's custody outweigh the

13

benefits she would have in her father's custody," and the trial court agreed with Dr. Nelson's conclusion.[9]  The trial court acted well within its discretion in so concluding.

Because of CC's strong bond with and attachment to her mother, the trial court (in agreement with Dr. Nelson) also found there is a significant risk that CC would develop "emotional difficulties" or "mental trauma" "that would negatively impact [her] functioning if she is separated from her mother for much of the year."

Greg mentions Dr. Nelson's findings only in a footnote, when he comments that "neither Dr. Nelson nor anyone else testified about the potential 'mental trauma' to CC. Rather, Dr. Nelson said only that CC 'would be at risk for some degree of emotional difficulties if she's living for long periods of time away from her mother,' and that there is 'a very high likelihood that she would have some adjustment or emotional problems if she's separated from her mother for long periods of time.' "  Presumably Greg's contention is that Dr. Nelson did not adequately describe or quantify the types of difficulties or problems CC would experience if the move-away request was denied, and that this somehow undermines his conclusion that it is in CC's best interest to remain in her mother's custody.  We disagree, for two reasons.  First, "Footnotes are not the appropriate vehicle for stating contentions on appeal." (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947.)  Second, and more importantly, we find Greg mischaracterizes Dr. Nelson's actual testimony and seemingly ignores his written report.

At trial Dr. Nelson was asked, "what[ ] [in] your opinion would be more emotionally detrimental for CC, a potential for the alienation of her relationship with her father if she moves to North Carolina, or if she remains in California with her father and does not relocate with mother?"  He responded, "I think that it's a *very high likelihood* that she would have some adjustment or emotional problems if she's separated from her

---

[9]  As noted above, so did CC's court-appointed counsel.

14

mother for long periods of time. I think that [there is] *a strong likelihood* of that happening. [¶] As far as her becoming alienated from her father . . . if she moves with mother to North Carolina, I think I'm very concerned about that but *it's an unknown. It's a potential.*" (Italics added.) Moreover, in Dr. Nelson's report he stated, "A *significant concern* for this examiner is the risk of [CC] developing emotional difficulties which would negatively impact her day to day functioning if she is separated from her mother for much of the year." In other words, Dr. Nelson balanced the significant and highly likely risk that CC will develop emotional difficulties that would impact her day-to-day functioning if she doesn't move to North Carolina with her mother, against the potential and unknown risk that she will become alienated from Greg if she does. We cannot say the trial court abused its discretion in agreeing with Dr. Nelson that it was in CC's best interest to grant the move-away request.

One final, and related, note. One of the *LaMusga* factors is "the extent to which the parents *currently* are sharing custody." (*LaMusga, supra*, 32 Cal.4th at p. 1101, italics added.) Citing this factor, Greg argues it is "irrelevant" that Karen may have been CC's primary caretaker in the past, because by the time of trial, "CC was spending approximately 43% of her time with Greg." Greg thus argues the trial court "abused its discretion in attaching *any* significance to who was CC's primary caretaker years ago." (Italics added.) We disagree. As discussed above, numerous cases teach that courts should strive to avoid "disruption of established patterns of care and emotional bonds with the primary caretaker." (*LaMusga, supra*, 32 Cal.4th at p. 1093.) Thus, even if CC currently spends more time with Greg than she did before her parents separated, the trial court was not required to ignore the established patterns of care and emotional bonds between CC and Karen that developed over the child's lifetime, and it was not required to ignore the fact that Karen always has been, and still is, CC's primary caretaker.

15

*ii.* *Parental Alienation*

The main focus of Greg's briefs is on parental alienation, and his primary argument is that the trial court failed to adequately consider the evidence of Karen's alienating behavior and her refusal to actively facilitate CC's relationship with him. Parental alienation refers to behaviors by one parent that negatively influence or poison a child's relationship with the other parent. To borrow from the underlying findings in *LaMusga*, Greg contends "that [Karen's] inability to 'let go' of her anger toward [Greg] caused her to project those feelings onto their children and to reinforce the children when they expressed negative feelings toward [Greg]. 'That aligns the children with [Karen] and results in a strained and hostile relationship with [Greg].' " (*LaMusga, supra*, 32 Cal.4th at p. 1085.) Greg further contends that if CC moves to North Carolina, it is inevitable that Karen's alienating behaviors will eventually destroy the father-daughter relationship.

While we agree with Greg that parental alienation is a concern, we disagree with his assertion that the trial court failed to adequately consider it. Instead, the trial court stated it "agrees . . . that parental alienation is a concern" in this case. For example, the trial court noted Dr. Nelson's " 'significant concern' that Karen will not support CC's relationship with Greg if CC moves to North Carolina, thereby running the risk that CC will become alienated from Greg as the twins have become." The trial court also noted, "The twins' negativity toward Greg and resistance to seeing him seemed disproportionate to what Dr. Nelson would expect under the circumstances, further supporting his concern that Karen had responsibility for the depth of the twins' negativity and resistance." The trial court also noted that Sheppard, the children's court-appointed therapist, believed the move-away request was " 'a difficult call' " because of the risk that CC would become alienated from Greg due to the influence of Karen and the twins. The trial court summarized Dr. Drozd's testimony regarding the risk of parental alienation in this case, noting that it, too, had concerns in this area. Finally, the trial court noted that Dr. Nelson

16

thought Greg was more likely than Karen to facilitate CC's relationship with the other parent. The trial court thus did not fail to consider the evidence of parental alienation. Instead, and as discussed in detail above, it simply agreed with Dr. Nelson's conclusion that, despite the risk of parental alienation, "that concern does not outweigh the greater risk of mental trauma which would be caused to not allow [CC] to primarily live with her mother who has always been her primary caretaker." It acted well within its discretion in so concluding.

Greg also points to Karen's actions in alienating William and Virginia from him as the best evidence that she will also alienate CC from him if the move-away request is granted. The trial court considered this evidence as well. For example, it found "Karen shared very negative information about Greg with Virginia to make Greg look bad," and "Karen had a great deal of responsibility for the estranged relationship between the twins and Greg."

However, the evidence that Karen is solely or even primarily responsible for the twins' estrangement is far more equivocal than Greg acknowledges. As the trial court found, "William and Virginia at this time have little contact with their father . . . . [Greg] argues that this is due to [Karen's] alienation, however evidence at trial also suggested that William and Virginia knew about [Greg's] affair and began to distance themselves from him as he distanced himself from the family." Apparently rejecting this evidence, Greg supports his argument by selectively citing only the evidence that supports it and ignoring the evidence that does not. This is improper on appeal. "When appellants challenge the sufficiency of the evidence, all material evidence on the point must be set forth and not merely their own evidence. [Citation.] Failure to do so amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact." (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1255.) Presumptions aside, here is some of the evidence that contradicts Greg's view that Karen is to blame for his strained relationship with William and Virginia.

17

Greg admitted to Dr. Nelson that he bears some of the blame for the breakdown in his relationship with William and Virginia. According to Dr. Nelson, Greg "blames both he and Karen in terms of the situation with William and Virginia in terms of them not wanting to have much contact with him. Gregory believes that William and Virginia are probably very angry at him and that they likely feel as though he abandoned them when he moved out of the home."

Karen believes the conflicts between Greg and William and Virginia began around 2017, when Greg "became very distant from Karen and the children," was frequently gone from the family home for work or pleasure, missed a lot of the kids' activities, and had basically "checked out" from the family. She also states Greg had an extramarital affair.[10] Karen testified she did not tell William about the affair, but William told her "he had seen texts between his father and other women for several years and came to an assumption . . . that father was involved in . . . some type of dishonest relationship." Karen also testified she does "not recall" telling Virginia about the affair but she "believe[s] [Virginia] is aware of the situation."

William and Virginia confirmed much of Karen's explanation for the rift with their father. For example, William told Dr. Nelson that Greg left the family, was only home four or five days a month, and was never around for William or his siblings. He also stated he observed his father texting another woman about two years before his parents separated, and this upset him. Sheppard, the children's court-appointed therapist, confirmed during his deposition that William "was very upset with his dad because he had seen text messages between his dad and somebody else and had suspicions that he was involved with another woman." It was also Sheppard's perception that "in this

---

[10] During the trial, Greg admitted only to an "indiscretion" during his marriage. However, he told Dr. Nelson he had an affair, and several witnesses, including Greg and Karen's marriage counselor, confirmed this.

family . . . their value system is highly against an . . . extramarital affair." William also told Dr. Nelson his father did not respect his mother and would sometimes not speak to her, and Dr. Nelson states William was "tearful" when he described this dynamic. William told Dr. Nelson he was angry at and disappointed in his father. William also stated his mother does not talk about his father at home. Although William believes he will eventually have a relationship with his father, he is not comfortable speaking to him at this time. As described by William, much of the blame for his estrangement from Greg can be laid at Greg's feet rather than Karen's.

Virginia's perception is similar to William's. She told Dr. Nelson that speaking with Greg was "uncomfortable," and she does not currently see a path forward to have a relationship with him. She told him that she and Greg were never really close. She told him that she knows her dad was unfaithful. Like William, she told him that Greg was gone "all of the time" and was not involved with the children, and that Karen does not speak to her about the divorce. When Dr. Nelson asked her to describe Greg's parenting strengths, she stated it was difficult to do so because he was not around much. As with William, Virginia's description of the reasons for her estrangement from Greg were due to her father's actions.

By failing to acknowledge his role in the deterioration of his relationship with William and Virginia, Greg overestimates the risk that Karen will alienate CC from him if CC moves to North Carolina.

We acknowledge that there is evidence in this case of Karen's alienating behavior and her refusal to actively facilitate CC's relationship with Greg. But the trial court was not required to give that evidence more weight than it gave to the evidence of CC's stronger and longer bond with Karen. (*LaMusga, supra*, 32 Cal.4th at p. 1093 ["weight to be accorded to such factors must be left to the court's sound discretion"].) We reiterate the limited scope of our review under the deferential abuse-of-discretion standard. "The test is not whether this court would have made the same order or whether

19

the trial court could have reasonably made some other order, but 'whether the trial court could reasonably have concluded that the order in question advantaged the "best interest" of the child.' (*Burgess, supra*, 13 Cal.4th at p. 32.)" (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 595.) The trial court could reasonably have concluded that it was in CC's best interest to remain in Karen's primary physical custody in North Carolina.

### iii.    The LaMusga Factors

As Greg acknowledges, the trial court discussed all of the *LaMusga* factors in its statement of decision. He argues, however, that the trial court's consideration of most of those factors, and of various other circumstances, was "deeply flawed." We disagree.

*Loss of contact with Greg*: Greg asserts—and no one disputes—that it is the policy of this state "that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage." (§ 3020, subd. (b).) As we noted above, however, frequent and continuing contact is difficult (if not impossible) when the parents live on opposite sides of the country. In this situation, courts have no option but to award primary physical custody to one parent, even if that means the other parent will have less contact with the child. Again, that is why move-away cases are so difficult.

Here, the trial court found it was in CC's best interest to award primary physical custody to Karen. We recognize that this may not seem fair to Greg. (See *Bryant, supra*, 91 Cal.App.4th at p. 794 ["Unfortunately where, as here, both parents are competent and loving, there is frequently no solution that is fair to everyone involved"].) However, we disagree with Greg that the resulting loss of frequent contact with him weighs *against* Karen's move-away request, because the focus here is not on what is fair to Greg, but what is in CC's best interest.

In a similar vein, Greg argues the trial court "failed to consider or analyze the harm to CC of losing her father due to relocation." To the contrary, the trial court did consider this harm, and it noted that "missing her father" was one of the primary

20

disadvantages of the relocation. The trial court simply concluded that this disadvantage was *outweighed* by the primary advantages of the move, namely, that CC would continue to live with the parent with whom she has the strongest attachment and who has always been her primary caretaker. "That the move of a custodial parent may have an adverse effect on the frequency of contact by the noncustodial parent is not by itself determinative. What is determinative is the best interest of the child[ ] given that one parent is moving and the other is not." (*Bryant, supra*, 91 Cal.App.4th at p. 794.)

*Wishes of child*: *LaMusga* instructs that trial courts should consider "the wishes of the children if they are mature enough for such an inquiry to be appropriate." (*LaMusga, supra*, 32 Cal.4th at p. 1101.) CC wanted to move to North Carolina with her mother, and the trial court appropriately noted her wishes, while also stating it was "cognizant of the fact that [CC] is only eleven years old and [it] will weigh the importance and meaning of her expressed wishes with that fact in mind." We take this to mean the trial court considered CC's wishes but gave them less weight in light of her young age. Contrary to Greg's assertion, there is no requirement for the trial court to state how much weight it gave CC's preferences.

Moreover, to provide some context for this particular finding, we note that Dr. Nelson opined as follows: "Given [CC's] age, it could probably be argued that she is not mature enough for an inquiry to be appropriate with regards to her wishes. [¶] However, [CC] *is a mature and bright child for her age and I believe that her voice should be heard*." (Italics added.) Indeed, even Dr. Drozd, Greg's expert, testified "I absolutely think that a child's voice should be listened to." In a footnote, Greg states CC's "preference should be given little, if any, weight." We disagree.[11] *LaMusga* teaches the trial court had discretion to consider CC's wishes, and it did so. Moreover, in *Burgess*,

---

[11] And again, footnotes are not the place to be making arguments on appeal. (*Sabi v. Sterling, supra*, 183 Cal.App.4th at p. 947.)

our Supreme Court held a trial court "could properly consider the preferences" of children ages 10 and 13. (*Burgess, supra*, 13 Cal.4th at p. 39.) The trial court in this case did not abuse its discretion in considering the wishes of a mature 11-year-old.

*Reasons for move:* As a general rule, as long as the parent has good faith reasons for the move, the court does not inquire into the wisdom of those reasons. As our Supreme Court has cautioned, however, "Absolute concepts of good faith versus bad faith often are difficult to apply because human beings may act for a complex variety of sometimes conflicting motives." (*LaMusga, supra*, 32 Cal.4th at p. 1100.) Thus, "Even if the custodial parent has legitimate reasons for the proposed change in the child's residence and is not acting simply to frustrate the noncustodial parents contact with the child, the court still may consider whether one reason for the move is to lessen the child's contact with the noncustodial parent and whether that indicates, when considered in light of all the relevant factors, that a change in custody would be in the child's best interests." (*Ibid.*)

The trial court found Karen has "numerous and significant" good faith reasons for moving to North Carolina, including that: she grew up there; her parents, two siblings, and other extended family members live there; she has friends there and thus will not have to create a social network from scratch; her two older children will be attending college there; and all of her children have spent significant amounts of time there and enjoy it very much. As Karen testified at trial, North Carolina is "home," and wanting to return home in the aftermath of an acrimonious divorce is understandable. (See, e.g., *Bryant, supra*, 91 Cal.App.4th at p. 794 [mother's "desire to have the comfort and support of her parents and other family members in the aftermath of the dissolution of her marriage cannot be fairly described as whimsical"].)

Greg does not challenge any of these findings. Instead, he argues Karen also wants to move to North Carolina in order "to lessen CC's contact with Greg due to [her] perception of how Greg has harmed the family." He cites a single piece of evidence to

22

support his argument—a text from Karen to a friend that states, "Us moving to North Carolina, which we all want, will be the best for us. Putting all of us through psych evals, making us suffer financially, and telling us we have to stay somewhere with no support, et cetera, is awful. He can live his life with the mistress but needs to stop the selfishness and let us go from this prison and let us be happy." This one text does nothing to undermine the trial court's finding that there are "numerous and significant reasons" that support Karen's decision to move to North Carolina, and that the move "appears to be in good faith, rather than merely an attempt to preclude [Greg] from exercising custody."

*Alternatives to CC moving to North Carolina*: Greg complains the trial court "fail[ed] to consider or even acknowledge the reasonable alternative to CC relocating." It is not clear precisely what "reasonable alternative" Greg contends is available, but it appears to involve Karen *not moving to North Carolina*, because he notes she "did not *need* to move to North Carolina, such as for a job; in fact, she remains a licensed attorney in California and a partner at a Stockton law firm, but is not licensed to practice law in North Carolina." (Italics added.) As noted above, however, whether Karen needs to move is irrelevant, because she has no burden to show the move is necessary. (*Burgess, supra*, 13 Cal.4th at p. 36.) Moreover, the trial court was required to (and did) "proceed on the assumption that the parent will in fact be moving, and must fashion a custody order that is in the best interests of the minor accordingly." (*Mark T., supra*, 194 Cal.App.4th at p. 1120.) At oral argument, Greg emphasized that if the trial court had awarded him primary physical custody of CC, Karen could still visit her for half of every month, and CC would then get to spend an equal amount of time with both parents. That would require the trial court to assume that Karen would not actually move to North Carolina as planned, or would effectively become bicoastal. Again, our Supreme Court instructs that trial courts must assume the relocating parent will actually relocate as planned, and it cannot craft an order that coerces the moving parent to abandon those plans. (*LaMusga, supra*, 32 Cal.4th at p. 1098.)

23

*Ties to Stockton:* Greg argues CC has stronger ties to Stockton than she does to North Carolina. CC does have strong ties to Stockton. As the trial court found, however, she also has strong ties to North Carolina. The trial court recognized all of these ties. CC will be surrounded by family and friends in both Stockton and North Carolina, and this factor thus cuts neither for nor against the move-away order.

*Distance of move:* The trial court considered "the distance of the move." (*LaMusga, supra*, 32 Cal.4th at p. 1101.) Indeed, it noted that the distance of the move is one of the things that makes this case so difficult. With little to no analysis, Greg concludes "this factor weighs *against* Karen's relocation request given the barrier to Greg having frequent and continuing visits with CC caused by the distance." Under Greg's logic, a parent could only relocate a short distance, because the farther the move, the harder it is to maintain regular contact between the nonmoving parent and the child. That is not the law. (See, e.g., *In re Marriage of Abargil* (2003) 106 Cal.App.4th 1294 [upholding move-away order permitting the mother to move to Israel with child]; *In re Marriage of Condon* (1998) 62 Cal.App.4th 533 [upholding move-away order permitting the mother to move to Australia with child].)

*Relationship between the parents:* The trial court considered "the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests." (*LaMusga, supra*, 32 Cal.4th at p. 1101.) Indeed, the trial court spent more time discussing this factor than any other. Almost *everybody* involved in this case—from Greg and Karen themselves, to their friends, to Dr. Nelson, to Dr. Drosz, to the trial court—agrees that the parents' relationship is acrimonious, and that this has negatively impacted both their ability to communicate and cooperate and their willingness to put CC's interests above their own.

With no discussion or analysis, Greg simply asserts "the court should have found this factor weighs *against* Karen's move-away request. It abused its discretion in failing

24

to do so." That is the extent of Greg's argument. "[I]t is not an appellate court's job to develop arguments for the parties. In view of [Greg's] failure to present any reasoned legal analysis of the point, we deem the contention waived." (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1196, fn. 2.)

*Weight given to factors:* Finally, Greg complains the trial court "gave no indication as to what weight it gave each of these factors in arriving at its decision." Greg cites no authority for the proposition that the trial court was required to specify how much weight it gave each factor, and the law appears to be otherwise. As our Supreme Court has stated, trial courts "would do well to state on the record that they have considered [certain things], but the lack of such a statement does not constitute error and does not indicate that the court failed to properly discharge its duties." (*LaMusga, supra*, 32 Cal.4th at p. 1093.)

### D. Conclusion

We conclude by reiterating our Supreme Court's holding in *LaMusga* that "we must permit our superior court judges—guided by statute and the principles we announced in *Burgess* and affirm in the present case—to exercise their discretion to fashion orders that best serve the interests of the children in the cases before them." (*LaMusga, supra*, 32 Cal.4th at p. 1101.) The trial court did just that in this case. After considering all of the *LaMusga* factors and other relevant circumstances, it concluded it was in CC's best interest to grant Karen's move-away request and to keep CC in the physical custody of the parent who has always been her primary caretaker. For all of the reasons stated above, we find the trial court did not abuse its discretion in so concluding.

## II

### Exclusion of Evidence

### A. Additional Relevant Facts

During the trial, Greg's counsel asked Karen on cross-examination, "Do you recall an incident taking place in your garage in June of 2019 in which you locked CC in the car

25

and demanded that Greg commit to the marriage?" She responded, "I recall a situation that took place within the home and the garage that was a very difficult situation. CC -- I don't recall CC ever being in a car, what you're referring to." She was then asked, "You don't recall locking CC in the car and her screaming, 'I want to go into the house'?" She responded, "I don't recall."

Greg's counsel then sought to play an audio recording of the incident as impeachment evidence, and Karen's counsel objected that the recording had not been produced prior to trial.[12] Greg's counsel than made the following offer of proof regarding the recording: "the parties had an argument, and [Karen] pulled CC out of bed and locked her in the car. And while this child was hysterically screaming, 'Let me out. Let me go back in the house. I want to go back in the house.' And [Karen] continued on and on, 'You must commit to the marriage,' and totally ignored this hysterical child. It goes to a lot of things relating to the best interest of this child, including why she might not want to tell her mother things that she likes about being with her father. It goes to [Greg's] statements that [Karen] has been explosive in terms of anger." The trial court, noting it was "thinking out loud," stated "both sides knew this would be a serious issue at trial, [so] this is something that should have been brought up in motions in limine. Not something that should be brought up as impeachment. [¶] You were going to try to prove this incident all along. And so this recording should have been turned over." The trial court then stated it would listen to the recording, "But at this point I'm not going to make a decision. But I may have to take it under submission. But I'm not going to allow you to ask [Karen] about it right now." After listening to the recording outside the

---

[12] The Superior Court of San Joaquin County, Local Rules, rule 7.103(F) provides, "Parties must exchange three days prior to the hearing all documentary evidence that is to be relied upon for proof of any material fact at the hearing. This requirement does not apply to documents used primarily for rebuttal or impeachment purposes."

presence of the parties, the trial court reiterated, "I'm going to reserve on this issue. I'm not going to allow you to ask [Karen] about the recording right now. . . . I think the main issue is whether or not this should have been turned over in discovery or whether or not it is in fact impeachment."

Thereafter, the trial court would not allow Greg's counsel to play the recording for Dr. Nelson during his testimony because it was not impeachment evidence as to him. As the court (properly) noted, "This is the risk of classifying it as impeachment evidence. That's the risk that your side ran in not turning it over, not listing it as an exhibit . . . . [¶] I'm not going to let you ask Dr. Nelson about it. He should have been [given] that recording when he wrote this evaluation.[13] He should have been allowed to listen to that recording before he was deposed. He wasn't. I'm not going to allow you to play it right now and have it potentially affect his testimony in a trial. This should have been done prior to trial." The court also noted it was still reserving ruling on whether Greg would be allowed to ask Karen about the recording.

Greg subsequently testified about the incident in detail. He also testified he recorded the incident because he "believed it was very important that people understood the emotional abuse that was happening in our home." Greg's counsel did not take this opportunity to ask the trial court to rule on the admissibility of the recording.

At the end of trial, Greg's counsel bought up the recording again, and the trial court stated it would not admit it because "[a]t this point the trial is complete." The court noted if it admitted the recording, "[Greg] will have to retake the stand and talk about it;

---

13 Greg told Dr. Nelson about the incident, and Dr. Nelson described it in his report as follows: "In the spring of 2019, in the early morning, Gregory and Karen were arguing. Karen wanted to be intimate, whereas Gregory did not, and this led to a significant argument at home. When she was very angry, Karen grabbed [CC] out of her bed and put her in the car. Gregory describes [CC] as being 'terrified.' Gregory left the house and he called a friend who was a police officer and this friend picked Gregory up. Gregory returned home later on after Karen had calmed down."

[Karen] will have to retake the stand and talk about it." It further explained, "I am not finding it's a discovery violation . . . . [W]e've listened to it in a 402 type hearing. There has not been . . . foundation . . . . It's too late in the game. I heard all the details of that incident, and so at this point I am not going to admit it."

## B.    Analysis

"A trial court's ruling on the admissibility of evidence . . . will not be disturbed on appeal absent an abuse of discretion." (*People v. Chism* (2014) 58 Cal.4th 1266, 1304.) Moreover, we will affirm the trial court's ruling excluding evidence " ' "if it is correct on any theory of law applicable to the case, even if for reasons different than those given by the trial court." ' " (*Phipps v. Copeland Corporation LLC* (2021) 64 Cal.App.5th 319, 339, fn. 9.) Finally, a judgment or order will not be reversed based on the erroneous exclusion of evidence unless the error is prejudicial, meaning it is "*reasonably probable* that a result more favorable to the appealing party would have been reached in the absence of the error." (*O'Hearn v. Hillcrest Gym & Fitness Center, Inc.* (2004) 115 Cal.App.4th 491, 500.)

We need not decide whether it was error to exclude the recording, because we conclude any error was not prejudicial. "The law is established that the erroneous exclusion of evidence is not prejudicial error where the excluded evidence is cumulative to other evidence which is introduced at the trial." (*People v. Valencia* (1938) 30 Cal.App.2d 126, 129, italics omitted.) Here, Greg testified at length about the argument and Dr. Nelson described it in his written report, and a recording of the argument was thus cumulative.

### III

### *Motion for Reconsideration/New Trial*

## A.    Additional Relevant Facts

The trial concluded on May 11, 2021 (all further dates are in 2021). At a hearing held on June 15 regarding a dispute over custody during the summer, Karen's attorney

28

noted Karen was leaving for North Carolina on August 4 or 5. The court ordered that Greg have custody of CC from July 23 to July 30, and on "July 30th she'll go back . . . with mom. At that point I'll have issued an order with respect to the move away. [¶] Obviously if she starts school here, it will be August 9th. If she moves with [Karen], the move is on August 4th."

The court issued a proposed statement of decision granting Karen's move-away request on July 6, and a virtually identical final statement of decision on July 27. The final order granting the move-away request was entered on August 10. Entry of the final order triggered Code of Civil Procedure section 917.7, which provides that a judgment or order affecting custody of a minor child that allows the removal of the minor child from the state is "stayed by operation of law . . . for a period of 30 calendar days from the entry of judgment or order."

On or about August 5, Greg's counsel sent an e-mail to Karen's counsel citing Code of Civil Procedure section 917.7. Karen's counsel states this is the first time section 917.7 had been brought up—and Greg does not suggests otherwise.

On August 7, Karen flew with CC to North Carolina. On August 8, Greg sent a text to Karen stating, "We continue to operate under the restraining orders issued by the court in [our] matter.[14] After a judgment is issued, we will be operating under the statutory restraining order (917.7). CC should be in Stockton and starting Annunciation school on Wednesday."[15]

---

[14] It is unclear what restraining orders he refers to. The initial custody order, entered on or about October 21, 2019, utilized Judicial Council form FL-341(E), "Joint Legal Custody Attachment." Box 2f was checked, requiring the parties to discuss and consent to decisions involving "out-of-country" travel, but not "out-of-state" travel, which was blacked out.

[15] August 8 was a Sunday, and Annunciation thus started three days after Greg sent this text.

On August 9, Karen filed a request for an order allowing CC to attend St. David's school in North Carolina by remote means for the first 30 days of the school year while the final order was stayed pursuant to Code of Civil Procedure section 917.7. In support of the request, Karen stated CC had made the cross-country team at St. David's and had attended the first practice. She also stated St. David's started on August 17, and if CC had to return to Stockton for 30 days she would miss cross-country practices, new student orientation, back-to-school events, the first day of school, and meeting her new classmates. She stated CC was devastated at the thought of having to return to Stockton and miss the first month at St. David's.

On August 11, Greg filed an opposition to Karen's request. In it, he stated he intended to file a motion for reconsideration and/or new trial "based on Karen's continued acts of parental alienation since trial, most notably those acts she has employed in her unilateral relocation of CC to North Carolina in violation of current restraining orders." He also asked the court to order that CC attend Annunciation school in Stockton (the school she had attended since kindergarten) "for at least the current semester for the sake of continuity while the Court continues to sort out this matter."

On August 11, CC's court-appointed counsel filed a declaration supporting Karen's request that CC be allowed to attend St. David's remotely. CC's counsel characterized Greg's insistence on the 30-day stay as "preposterous" and "against any best interest for CC." She stated, "this 30-day delay will put [CC] behind socially and academically, as she will not be able to begin her 7[th] grade career in person, as all of her classmates will. Following the 30-days (which will have no benefit to CC), CC will then move to North Carolina and 'begin' school in person, a month after everyone else has begun. She will then be required to become acquainted, settled in and catch-up socially, emotionally and academically with her classmates who have already been doing so together, for the previous 30-days. [¶] . . . [¶] CC is distraught at the thought of not beginning her new school year in person with all her classmates and teammates."

30

A hearing on Karen's request was held on August 12. The court expressed surprise that the issue had come up, noting, "when we set this for trial in May, the anticipation was if the Court denied the move away, [CC] would stay here and go to Annunciation. . . . If the Court granted [the move away], she would start the new school year in North Carolina." The court also noted, "If I thought this would have been an issue, I would have pushed this a lot quicker, but I didn't think it would be an issue." It also noted the "stay is automatic versus [CC's] best interest. [¶] . . . [¶] . . . Ultimately who is going to hurt from this is CC, because she believes she's starting school in North Carolina." The court granted Karen's request that CC be allowed to attend St. David's remotely during the stay.

On August 20, 2021, Greg filed a motion for reconsideration of the final order and/or a new trial based on "new evidence" concerning the events surrounding CC's move to North Carolina on August 7. In support of his motion, Greg filed a declaration that provided additional information regarding the circumstances of CC's move to North Carolina on August 7.

From this evidence, we learn that on August 6, a day after Greg's counsel first mentioned Code of Civil Procedure section 917.7 to Karen's counsel, Karen sent him two texts asking whether he expected CC to remain in Stockton for the next 30 days. Greg did not respond. Karen did the same on August 7 and 8, and again, Greg did not respond. Greg finally responded—on the afternoon of August 8, 12 hours after Karen's most recent text—that the court's final order was stayed for 30 days and that CC "should be in Stockton and starting Annunciation school" in three days.

As noted above, Karen filed her request for a temporary order on August 9, and the court granted the request on August 12.

In the meantime, CC began frantically texting Greg, asking that she be allowed to stay in North Carolina and start school there. On August 8 she texted Greg, "I don't wanna go back to Stockton," and, "I just got here and I don't wanna leave." Greg

31

responded, "I love you very very much." On August 9, CC texted, "If you supported me you would listen to me and not make me do online learning I just wanna to go st David's in person with my new [friends]." Greg responded, "I always do what I understand to be the best for you." Later that day CC texted, "I made the cross country team here and everything and ur gonna ruin my life if u make me go back so please just let me stay I just got here and love it." Greg did not respond.

On August 13, the day after the court granted Karen's request, CC texted Greg, "I'm not gonna be able to make any friends bc every one is gonna already have friends when I come back and when I could be making new friends meeting new teachers going to cross country practices going to meets your gonna make me sit in a room with none of my friends from st David's and work that's so mean." Two hours later she texted, "Could you just fly here," "Pleazeee," and "Just come and go in a hotel or something." Greg did not respond. On August 14, CC texted, "Dont do this to me. Please don't do this." Greg responded, "This is a really bad situation but we have to do what the law says." CC responded, "No you are lying. Sasha [her court-appointed counsel] told me you can say yes." And finally, "I really hate you. You can come here. Your the worst dad."

At a hearing held on October 19, the court denied Greg's motion to reconsider and/or for a new trial, noting, "The Court does not feel that additional evidence regarding these issues would change the Court's decision." It also noted, "I can't imagine reopening for additional evidence, because I think what would happen is every[ ] three months we'd have additional evidence by one side or the other regardless of what the Court's decision was."

### B.    *Analysis*

We may review an order denying a motion for reconsideration or for a new trial where an appeal is taken from the underlying judgment or order. (Code Civ. Proc., §§ 906, 1008, subd. (g).) The trial court's denial of a motion for reconsideration or for a

32

new trial is reviewed for an abuse of discretion. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176; *Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1457.) " ' " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " ' " (*Garcia v. Rehrig Internat., Inc.* (2002) 99 Cal.App.4th 869, 874.) For two reasons, we conclude no such abuse of discretion appears here.

First, a party moving for a new trial based on newly discovered evidence must show the evidence "is likely to have produced a different result." (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 438.) Here, the court stated on the record that it "does not feel that additional evidence regarding these issues would change the . . . decision." "There is always some conjecture in determining whether newly discovered evidence was likely to produce a different result where the case was tried to a jury. . . . But where, as here, the same trial court to which the case was tried determines the new evidence was unlikely to have made a difference, there is no conjecture. We simply have no basis for contradicting the trial court." (*Wood v. Jamison* (2008) 167 Cal.App.4th 156, 161.)

Second, all the new evidence on which Greg's motion was based concerned events that occurred several months *after* the trial ended. New evidence within the meaning of the new trial statute, however, "must be evidence that was in existence at the time of the trial." (*Aron v. WIB Holdings* (2018) 21 Cal.App.5th 1069, 1079.) "[E]vidence of events occurring after the trial is not newly discovered evidence." (*Id.* at p. 1080.) Any other rule would lead to endless requests for reconsideration or new trial. As the trial court aptly noted, "I can't imagine reopening for additional evidence, because I think what would happen is every[ ] three months we'd have additional evidence by one side or the other."

## DISPOSITION

The final order granting Karen's move-away request and awarding her physical custody of CC is affirmed.  Karen shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1),  (2).)

_____/s/_____
EARL, J.

We concur:

_____/s/_____
HULL, Acting P. J.

_____/s/_____
RENNER, J.